2015 IL App (1st) 133874
No. 1-13-3874
Opinion filed September 18, 2015

FIFTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08 CR 4784 |
| IGNACIO CASTELLANO, | ) ) | The Honorable Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1     Defendant Ignacio Castellano, age 34 and mentally retarded, was convicted after a bench trial of first-degree murder and two counts of aggravated battery, and sentenced on November 21, 2013, to a total of 32 years with the Illinois Department of Corrections.

¶ 2    On this direct appeal, defendant asks this court to reduce his murder conviction to second-degree murder, arguing that he proved by a preponderance of the evidence a mitigating factor, namely, that he had an actual, although unreasonable, belief in the need to act with deadly force to defend himself and another. 720 ILCS 5/9-2(a)(2) (West 2008).

¶ 3    With respect to second-degree murder, the factfinder must first conclude that the State proved beyond a reasonable doubt that the defendant committed first-degree murder *before* the factfinder considers whether defendant proved by a preponderance of the evidence one of the mitigating factors required for second-degree murder. 720 ILCS 5/9-2(c) (West 2008); *People v. Thompson*, 354 Ill. App. 3d 579, 586 (2004). On this appeal, defendant does not claim that the State failed in its initial burden of proving him guilty beyond a reasonable doubt of first-degree murder.

¶ 4    Since defendant challenges neither the State's satisfaction of this initial burden nor the aggravated battery convictions, the sole issue on appeal is whether the trial court should have reduced the murder charge to second-degree murder based on defendant's claim of imperfect self-defense. *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995) ("The imperfect self-defense form of second degree murder occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable.").

¶ 5        In reviewing defendant's claim, we do not consider what we would have done if we had been standing in the trial court's shoes. Instead, we consider whether any rational trier of fact could have reached the same conclusion that the trial court did. *People v. Blackwell*, 171 Ill. 2d 338, 357 (1996) (the question is whether "any rational trier of fact" could have reached the same conclusion) (emphasis and internal quotation marks omitted). A careful review of the trial record shows that a rational trier of fact could have reached the same conclusion. Thus, for the reasons explained in greater detail below, we affirm.

¶ 6                                    BACKGROUND

¶ 7        On February 9, 2008, a fight among five men in a gangway on South Drake Avenue ended with two men fatally stabbed. The two decedents were Ramiro Landa, defendant's brother-in-law, and Rafael Villagrana. The remaining three men were: defendant; Javier Cahue; and Jesus Sanchez. Both defendant and Javier Cahue testified at trial, but Jesus Sanchez did not. The trial court concluded that it "simply" did not "believe [defendant's] testimony," while "Cahue was testifying "credibly."

¶ 8        Defendant was indicted for: (1) the first degree murder of Rafael Villagrana; (2) the first-degree murder of Ramiro Landa; (3) the attempted first-degree murder of Jesus Sanchez; (4) the aggravated battery of Jesus Sanchez; (5) the aggravated battery of Javier Cahue. The trial court found defendant not

guilty of the murder Ramiro Landa and not guilty of the attempt murder of Jesus Sanchez, but guilty of the murder of Villagrana and guilty of the aggravated battery of both Jesus Sanchez and Javier Cahue.

¶ 9                                      I. Evidence at Trial

¶ 10       As stated above, our review demands a careful consideration of the evidence at trial, which we describe in detail below.  As this court has emphasized, our review must not be a "mindless rubber stamp on every bench trial guilty verdict we address."  *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000).

¶ 11                                  A. State's Case-In-Chief

¶ 12                                      1. Javier Cahue

¶ 13       Javier Cahue testified that, in February 2008, he lived alone in a coach house in a rear yard on South Drake Avenue.  A gangway ran along the side of the main building which led to the rear yard. Cahue was at home watching videos with Jesus Sanchez[1] and Rafael Villagrana when they decided to depart at 9:20 p.m. on February 9, 2008, to attend a birthday party. Villagrana went down the stairs first, with Jesus Sanchez following and Cahue behind Jesus Sanchez.  When Cahue reached the bottom of the stairs, he observed two men

---

[1] Since Willie Sanchez, Jesus' brother, and Chicago police officer Mario Sanchez testified at trial, we will refer to Jesus Sanchez by his full name to avoid confusion.

approaching from the street to the gangway. Cahue recognized one of the men as Ramiro whom Cahue had previously sold marijuana to. Although Cahue had not previously encountered the other man, Cahue identified him in court as defendant. Cahue testified that he had no problems with Ramiro Landa.

¶ 14 Cahue testified that Landa moved to Villagrana's side and defendant stabbed Villagrana in the chest, swinging more than once at Villagrana. Villagrana then moved toward the street. As Jesus Sanchez was running toward the street, defendant stabbed him in the back. After Jesus Sanchez was stabbed, he also moved toward the street, and defendant moved to "slash towards" Cahue with a punching motion but defendant caught Landa on the left side of the neck under the ear and blood started spurting. Defendant froze in apparent disbelief over what he had done to Landa. Cahue then started struggling with defendant trying to take the knife from defendant's hand, and Cahue did not feel the blade when his hand was cut. Defendant told Cahue "my beef ain't with you." Cahue let go of the knife, gave defendant a push toward the street and then closed the gate which was now between them. Defendant ran off towards the street.

¶ 15 Cahue testified that he waited a minute before walking to the street, where he observed Villagrana lying dead on the sidewalk and Landa lying further south on the sidewalk, but Cahue did not observe defendant or Jesus Sanchez. Cahue asked a neighbor to call the police and started walking away

out of fear that defendant would return. He called his brother who subsequently transported him to Mt. Sinai Hospital, where Jesus Sanchez was also being treated. Cahue needed stitches and his hands were bandaged. The police then transported him to a police station where he spoke with detectives and identified defendant from a lineup as the person who stabbed Jesus Sanchez, Villagrana, and Landa, and cut Cahue's hands.

¶ 16        Cahue testified that he did not observe words or gang signs exchanged before defendant drew his knife, and that no one but defendant possessed a knife or weapon. Cahue admitted that he sold drugs, that he had disposed of the cocaine and marijuana in his home before his brother transported him to the hospital, and that he had been convicted in 2005 for the manufacture and delivery of 500 grams or more of marijuana. He also admitted that he, Villagrana and Sanchez were all Latin Kings but stated that he was no longer in the gang. At the time of the incident Cahue weighed 280 pounds.

¶ 17                    2. Chicago Police Officer Mario Sanchez

¶ 18        Chicago police officer Mario Sanchez testified that he was in uniform and in a marked police vehicle at 9:20 p.m. on February 9, 2008, with Officer Perez[2] when he was dispatched to South Drake Avenue. When he arrived, he observed two bodies lying on the ground, and defendant kneeling over one of

---

[2] Officer Sanchez did not provide a first name for his partner, Officer Perez.

the bodies. Officer Sanchez, who is fluent in Spanish, heard defendant state "get up, come on, let's go, are you okay, get up."

¶ 19        Sanchez testified that, when the officers approached, defendant appeared to be in shock and asked Sanchez to call an ambulance for his brother-in-law which Sanchez did. Sanchez then asked defendant if they could speak to him in the police vehicle since it was cold outside. Defendant stated that it was better for him to speak to the officers in their vehicle because he did not want gang members to observe him speaking to the officers. Sanchez testified that the crime scene was located in "a high infested gang area" which included the Latin Kings.

¶ 20        After defendant entered the back of the vehicle and Sanchez and his partner entered the front, the officers asked what happened. Defendant responded that his brother-in-law wanted to buy drugs at a South Drake address[3] and instructed defendant to wait nearby. Subsequently, his brother-in-law ran out of the gangway stating that he had been stabbed and asking defendant to call the police. Defendant then ran across the street to his house to call 911 and returned to find his brother-in-law lying on the sidewalk. Another man ran out of the gangway and fell nearby. Then two more men ran out of the

---

[3] Officer Sanchez testified to the precise address, which was the address where Cahue testified he lived.

gangway, entered a black SUV and drove south on South Drake Avenue. The men also appeared injured.

¶ 21    Sanchez testified that defendant stated that he lived at a South Drake address where his brother-in-law also lived, and that defendant's wife was Ramiro Landa's sister.

¶ 22                                3. Detective Greg Swiderek

¶ 23    Detective Greg Swiderek testified that he and his partner David Roberts were assigned to investigate the stabbing of two people near South Drake Avenue on February 9, 2008. When they arrived, they observed two dead bodies and blood trails which led to and from a gangway by a South Drake address.[4] At 4 a.m. on February 10, they returned to Area 4 where they interviewed defendant from 4:30 to 5 a.m., with Detective Jose Garcia acting as a translator. After observing small cuts on defendant's left middle finger and index finger and after interviewing Cahue, Swiderek decided to activate the electronic recording interview system and interview defendant again. With Officer Garcia translating, Swiderek advised defendant of his *Miranda* rights and interviewed defendant for 20 minutes starting at 5:55 a.m. on February 10, 2008. See generally *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

---

[4] This was the same South Drake address where Cahue testified that he lived.

¶ 24    On cross, Swiderek testified that defendant's arrest report reflected that defendant was 5 feet 5 inches tall and weighed 130 pounds.

¶ 25                    4. Sergeant Jose Garcia

¶ 26    Sergeant Jose Garcia testified that he was fluent in Spanish and he acted as a translator during Detective Swiderek's interview of defedant at 4:30 a.m. on February 10, 2008.  After the interview, Garcia and his partner Detective Rios traveled to an address on South Drake Avenue, where defendant had stated that he resided and which was across the street from where the bodies were found. Garcia and Rios entered a gangway[5] on the south side of defendant's building and walked toward the rear entrance of the basement apartment. At the end of the gangway, there was an enclosed porch with a common stairway.  There were concrete steps leading down toward the basement apartment and stairs leading up to the first floor.  There was a door between the gangway and the common area which Swiderek had described.  This door was open. At the bottom of the concrete steps, directly in front of the door to the basement apartment, they found a bloody black jacket.  With respect to the door to the basement apartment, they observed blood stains around the lock area in the middle of the door, on the door jamb and on the light switch to the right of the door.  The officers then knocked on the door but no one responded.  Then

---

[5] This is not the gangway where the fight occurred.

Garcia walked to the front of defendant's building and then to the front of the house immediately to the north on South Drake Avenue. In the front yard of the house immediately to the north and just inside a fence, he observed a bloody knife laying in the snow.

¶ 27                              5. Forensic Investigator Brian Smith

¶ 28        Chicago police investigator Brian Smith testified that he and his partner Detra Gross processed the crime scene, including the bloody knife found in the front yard of the house immediately to the north of defendant's building and the bloody jacket found near defendant's apartment.

¶ 29              6. Marisol and Willie Sanchez, Siblings of Jesus Sanchez

¶ 30        Marisol Sanchez, the sister of Jesus Sanchez, testified that she visited Jesus at Mt. Sinai Hospital on February 10, 2008, and that he had a stab wound in his back. Jesus was 17 years old, 5 feet 7 inches tall and weighed 130 pounds.

¶ 31        Willie Sanchez testified that he was Jesus' older brother and that he was a member of the Latin King gang. Willie was serving a one-year sentence for felony criminal damage to property at the time of the trial. On New Year's Eve 2007 and into New Year's Day 2008, Willie was in front of his house on

South Drake Avenue[6] with his brother Jesus and another person named Jose James. At that time, Willie observed a person whom he later learned was named Ignacio. Although defendant's first name is Ignacio, Willie did not identify defendant in court as Ignacio. The following exchange occurred:

"ASSISTANT STATE'S ATTORNEY (ASA): And [at] some point did you see a person who you later learned was Ignacio?

WILLIE SANCHEZ: Yes.

ASA: Do you see Ignacio in court today?

WILLIE SANCHEZ: No.

ASA: Stand up and look around and tell me if you recognize anybody. If you do or you don't. Stand up please.

WILLIE SANCHEZ: No, I don't."

However, Willie subsequently identified People's Exhibit No. 49 as a photograph of Ignacio as Ignacio appeared when he was at Willie's house on New Year's Eve 2007, and Exhibit No. 49 is a photograph of defendant.

¶ 32     Willie testified that, when he observed Ignacio on New Year's Eve, Ignacio was drunk and carrying a 24 pack of beer down the street. Willie asked Ignacio if he wanted to come up and have a beer with them, and Ignacio agreed.

---

[6] Both Willie Sanchez and Javier Cahue testified that they lived on a property with the same street number on Drake Avenue. Sanchez lived in the front house, while Cahue testified that he lived alone in a coach house in the rear yard.

Later, Willie was asleep on the couch when Jesus woke him to say that Ignacio had urinated on Willie's daughter's toys. Willie observed liquid that appeared to be urine on the toys and observed Ignacio pulling up his pants. Willie told him to leave and a fight ensued, with Willie and Jesus both punching Ignacio in the face. Ignacio's left eyebrow was bleeding and he left. In 2008, Willie was 6 feet tall and 200 pounds.

¶ 33                    7. Stipulations Regarding Biological Evidence

¶ 34        The parties entered into a number of stipulations concerning the biological evidence and analysis in the case. The stipulations themselves were marked as People's Exhibits.

¶ 35        People's Exhibit Nos. 56 and 57 were stipulations to the blood standards obtained from decedents, Ramiro Landa and Rafael Villagrana, respectively; and Nos. 58, 59 and 60 were stipulations to the buccal swabs obtained from Jesus Sanchez, Javier Cahue and defendant, respectively.

¶ 36        No. 61 was a stipulation that Jennifer Belna, a forensic biologist with the Illinois State Police, had obtained DNA profiles suitable for comparison for: (1) Rafael Villagrana; (2) Jesus Sanchez; (3) Ramiro Landa; (4) Javier Cahue; and (5) defendant.[7] In No. 61, the parties also stipulated: (1) that DNA

---

[7] These five men were the five who participated in the fight on February 9, 2008.

obtained from blood stains on Javier Cahue's blue jeans matched the DNA profiles of both defendant and defendant's brother-in-law, Ramiro Landa; and (2) that DNA obtained from blood stains on the knife matched the DNA profiles of defendant and the two decedents, Ramiro Landa and Rafael Villagrana, and Javier Cahue could not be excluded from one of the mixtures found on the knife.

¶ 37    No. 62 was a stipulation that Debra Klebacha, a forensic biologist with the Illinois State Police, received defendant's jeans, a black jacket, a knife, and swabs from a light switch and door, and she processed and preserved these items for future DNA analysis.  No. 63 was a stipulation that Nicholas Richert, a DNA analyst employed with the Illinois State Police had analyzed the swabs from the black jacket, door and light switch and reached the following conclusions.  DNA obtained from blood stains on the jacket matched the DNA profiles of Ramiro Landa, Javier Cahue, and defendant.  DNA obtained from the blood stain on the light switch matched the profile of defendant, and DNA obtained from the basement door matched the profile of Javier Cahue.

¶ 38    Nos. 64 and 65 were stipulations regarding the testimony of  Dr. Michel Humilier, a forensic pathologist employed by the Cook County medical examiner's office. Humilier performed the autopsies of both Rafael Villagrana and Ramiro Landa and concluded that Villagrana's death was the result of

multiple stab wounds and that Landa's death was the result of a stab wound to the left side of the lower neck. Villagrana suffered three stab wounds, including a stab wound to the chest, a stab wound to the upper back, and a stab wound to the lower back.

¶ 39    After reading the stipulations and moving exhibits into evidence, the State rested its case in chief. Defendant then moved for a directed finding which the trial court denied.

¶ 40                                  B. The Defense's Evidence

¶ 41                                       1. Brian Miskell

¶ 42    Brian Miskell, a Chicago fire department paramedic, testified that on January 1, 2008, at 5 a.m. he was dispatched with his partner, Grace Flores Pacowixz, to South Drake Avenue[8] where he observed a battery victim. The victim was defendant who had a laceration above his left eye which was bruised and swollen shut, and a swollen left cheek. The victim also had an odor of alcohol on his breath. Miskel was told that defendant had lost consciousness at one point but Miskel did not testify who provided this information. Miskel and his partner then transported him to the emergency room of Mt. Sinai Hospital.

---

[8] The street number provided by Miskell was the same street number for the property occupied by Javier Cahue, who lived in the rear coach house, and Willie Sanchez, who lived in the front house. This was also the location where the fight on February 9, 2008, later occurred.

¶ 43                                    2. Dr. Amardeep Singh

¶ 44        Dr. Singh testified that he was the emergency room doctor at Mt. Sinai Hospital who treated defendant on January 1, 2008 at 5 a.m. Defendant, who was intoxicated, suffered a fracture to the upper left cheek bone, head trauma, and a facial laceration. Dr. Singh stitched the laceration but testified that it would still leave scarring. He testified that, according to his contemporaneous notes, defendant presented to the emergency room "with alcohol intoxication, assault with a pipe, possible loss of consciousness. Facial laceration, complaining of face pain and swelling." Based on his notes, Dr. Singh could not be certain that defendant was discharged the same day.

¶ 45                          3. Chicago Police Officer Ramiro Gonzalez

¶ 46        Chicago police officer Ramiro Gonzalez testified that he was in the gang enforcement unit. At the time of trial, his assignment concerned gangs throughout the city of Chicago. However, from December 2007 through February 2008, his assignment was limited to the 10th District which is from Roosevelt Road to "55 River" and from Cicero Avenue to Ashland Avenue. This area includes South Drake Avenue. Gonzalez testified that he was familiar with Javier Cahue, Willie Sanchez and Jesus Sanchez, and that they were all members of the Latin Kings.

¶ 47        Gonzalez testified that he routinely provided his cell phone number to victims of crimes and anyone else who wanted to provide information to the police. On February 9, 2008, at 9:16 p.m., Gonzalez received a call to his cell phone number from a phone number that he later learned belonged to defendant. When he asked whether he had an "independent recollection" of how he responded to that call, Gonzalez replied "[y]es" and then explained that he "always" told people to call 911.

¶ 48        In January 2011, Gonzalez was asked to obtain and did, in fact, obtain a police report regarding a robbery and battery on New Year's Eve 2007 or New Year's Day 2008 which occurred on South Drake Avenue.[9]

¶ 49        4. Stipulation Regarding Phone Records

¶ 50        The parties stipulated that, if an AT&T employee were called to testify, she would testify that a particular landline phone number was registered to an "Ignacio Garsellano" at defendant's address on South Drake Avenue and that a call was placed on February 9, 2008 at 9:16 p.m. from this landline to a phone number, which Officer Gonzalez had previously testified was his cell phone number. The call lasted 34 seconds. Two calls were then placed from the same landline to 911 at 9:17 p.m. lasting 41 seconds, and at 9:18 p.m. lasting 33 seconds.

---

[9] The street number was the street number of the property where both Javier Cahue and Willie Sanchez lived.

¶ 51                                    5. Defendant

¶ 52                                a. Direct Examination

¶ 53         Defendant, who testified through a Spanish interpreter, testified that his full name was Ignacio Garcia Castellano, that he was 34 years old and that he had never attended school, either in Mexico or in the United States. In 2007 and 2008, he was in a serious relationship with Petra Landa and they had three children together. Petra's brother was Ramiro Landa. In 2007, defendant was working at a company packing meat and living in a basement apartment on South Drake Avenue[10] with Petra, their three children, his brother-in-law and one of Petra's nephews.

¶ 54         Defendant testified that, on New Year's Eve 2007, he walked to the house of his friends Juan and Graciella on Drake Avenue where he had been invited for dinner. Defendant carried with him $600 which he had saved to purchase a vehicle, and he hoped to purchase it from them. Petra was not ready to leave, so she told defendant to call her later. When defendant called, Petra said it was too cold for the youngest to go outside.  After dinner, defendant started walking home on Drake Avenue when he observed two men, whom he did not know, standing on the sidewalk.  As he approached, he heard them talking about being

---

[10] Defendant provided the same address which Officer Mario Sanchez testified that defendant had provided on the day of the fight, and which was the subject of the stipulation regarding phone records.

glad that they had beaten someone up. They told defendant that if he wanted to pass, he had to give them a beer. Defendant responded that he had only one beer and that he had already taken a drink from it. Defendant identified one of the men from a photograph as Willie Sanchez. When defendant walked away, Willie Sanchez told him not to talk about what he heard Sanchez saying or Sanchez would kill him.

¶ 55    Defendant testified that he was afraid and crossed to the other side of street where he kept walking. Defendant observed another man whom he did not know but whom he identified in court from a photograph as Jesus Sanchez. Jesus Sanchez asked if defendant wanted a beer and defendant said no, thanks. Jesus Sanchez then grabbed defendant stating that he was a Latin King and that defendant was disrespecting him. Defendant was aware that area of Drake Avenue was controlled by the Latin Kings. Jesus Sanchez held defendant and the two other men ran over and all three hit defendant. Then they took defendant into a house and to the second floor. Willie Sanchez stated that defendant had just disrespected his brother and hit defendant in the forehead with a bottle.

¶ 56    Defendant testified that, after he was hit in the face with a bottle, the next thing he remembered was waking up downstairs, between the stairs and the door, laying face down. He felt pain in his back and his face, and he could hear

two men talking behind him. The third man was in front of him. Defendant did not move because he was afraid that, if he moved, they would attack him again. The two men behind him were arguing over who had hit him. The third man, who was by the door, said that he would take defendant to the alley. Defendant heard a vehicle pull up, and someone knocked, and a fourth man said he was going to pick something up and he needed money. The man by the door said that "paisas have money always." Defendant explained that "paisas" are from Mexico. The fourth man then stepped over defendant, removed defendant's wallet from defendant's pocket, removed the money and replaced the wallet. Then he exited and defendant heard the vehicle leaving. Then defendant heard the man by the door trying to light a cigarette, and the man by the stairs told him to bring it over here and he would light it. After the man by the door stepped over defendant, defendant rose and ran toward the open door.

¶ 57    Defendant testified that, once outside, he stumbled on the ice as he ran toward his brother's house. His brother, Juan Garcia Castellano, lived on Drake Avenue. The three men chased him and threw things at him as they ran. When he reached his brother's house, he opened the gate and knocked hard but the three men fell on top of him and were hitting him on his face, head and the back of his head. When his brother opened the door, the three of them ran. His brother picked him up and brought him in the house. When defendant asked to

use his phone, his brother advised him against it because they would kill defendant. However, defendant did not listen and called the police. After the police arrived, defendant showed them where he had been beaten. Police vehicles arrived and officers knocked on the door but no one answered. The police then placed defendant into an ambulance.

¶ 58    Defendant testified that he had his birthdate tattoed on his hand: "[b]ecause I don't know about letters or numbers and I forget."  The ambulance transported him to Mt. Sinai Hospital and he was released later that day. As a result of the beating, he had a lasting scar above his left eyebrow. After defendant was released from the hospital, he experienced a great deal of pain and he could not stay sitting, laying down or standing up for very long.  On the third day after his release, he returned to work. A day or two after the beating, defendant observed some men standing outside, and defendant recognized one of them and called the police. Officer Gonzalez came to talk to defendant, and he provided defendant with his phone number and instructed defendant to call again if defendant observed his attackers.

¶ 59    Defendant testified that, on February 9, 2009, in the evening, he was at home at his home on South Drake Avenue, watching television with his children. His brother Juan was over with his wife, and two of Petra's nephews were also there.  At 9 p.m. Petra's brother, Ramiro Landa, asked defendant to

accompany him to obtain an identification (ID). Defendant responded that he was afraid to go out, but Landa replied that, when defendant asked Landa to go somewhere, he did; so defendant agreed. Before leaving the house, defendant did not take any weapons and he did not observe Landa take any. After they exited the house, defendant walked behind Landa stating that it was dangerous for him to be on the street. After the beating on New Year's Day, defendant had stayed inside for long periods of time. Defendant and Landa were walking on Drake Avenue, when Landa walked into a yard. Defendant recognized the house as the house where he was beaten and he told Landa not to do that because this was the house where he was beaten. Landa replied that, as long as defendant was with Landa, defendant was safe. Landa then lifted up his jacket and defendant observed a knife. Landa stated that if they tried anything, he would "teach them a lesson." Landa told defendant that, if he was scared, defendant could go back. Defendant started to go back to his house but he was "very afraid" for Landa and defendant tried to pull Landa away. At this point, Landa was in the gangway and defendant was trying to pull Landa out of it.

¶ 60    Defendant testified that, as he was trying to pull Landa away, three men came running toward them and surrounded defendant. One of the three men was Jesus Sanchez who told defendant "all right, paisa, now I'm really going to kill you." Then defendant heard a whistle which he recognized as a signal that

21

gang members used to call others. When he heard the whistle, defendant became very scared and grabbed his brother-in-law's knife. Defendant was asked "[a]t the time that you grabbed the knife *** where were those men?" and he replied "[t]hey came at me and they started hitting me."[11] Defendant was then asked "[c]ould you tell whether any of them had weapons at that point?" and he replied "[n]o, no, no."[12] Defendant tried to push them, and he felt that he had cut one of them. Then he tried moving back. Defendant identified one of the three men from a photograph as Javier Cahue. The three men continued to beat him down the back of the gangway. When defendant moved back, "something in the shadow came at me" and defendant heard "you cut me already brother-in-law." Then Javier Cahue was behind defendant and hitting defendant, and defendant swung the knife back, and Cahue said that defendant had cut him. Cahue grabbed defendant's hands with both his hands, and Cahue was pushing the knife toward defendant's chest. At first, defendant could not do anything but then he grabbed the knife. Cahue held on to defendant with a lot of force but defendant was able to move a little to the side and Cahue let go.

---

[11] Defendant's testimony seems to indicate that he grabbed the knife before the three men "came at" him. However, on cross, he was asked to clarify this fact, and he responded that they started beating him before he grabbed the knife.

[12] It is ambiguous whether defendant's "no" was a response to whether he could tell or whether the men had weapons.

Cahue said "don't kill me, please don't kill me," and defendant replied that he did not want to kill anyone and that he was just defending himself.

¶ 61        Defendant testified that he then grabbed his brother-in-law but his brother-in-law said he could not walk and that he had lost a lot of blood. Defendant "got him out of that place" and then ran toward his house. After reaching his house, defendant took off his jacket and "threw it where [he] always thr[e]w it in [his] house," opened the door and called Officer Gonzalez from his home phone.  Gonzalez replied that he was at home and instructed defendant to call 911. When defendant called 911, he told them that several people were injured and they should send two or three ambulances.  After calling 911 and telling his girlfriend that her brother had been "cut," defendant ran back toward where his brother-in-law was laying and began to lift him up, but officers were already on the scene and one of them told him not to do that. Defendant told him that he "need[ed] to talk to an officer" because he "kn[e]w what happened," and the officer instructed defendant to enter the squad vehicle, which he did.

¶ 62        Defendant then identified a photograph of his jacket and the place where it was found, which he testified was "the little alley where I always come out." Prior to February 9, 2008, he was not aware that there was a house behind the

front house at that location on South Drake Avenue.[13] After defendant entered the back of the squad vehicle, he agreed to go to the police station at Area 4. When he first talked to the police at Area 4, "[o]ne of the officers threatened me. He told me that that he was going to put his hand in my behind." The officer claimed: "I do that to all the people who don't want to talk and they end up talking." The officer further threatened that "the judge was going to give [defendant] 70 to 80 years and that [the officer] was just going to go home." After those threats, defendant was very afraid but he eventually told the police the truth.

¶ 63        Defendant testified that, when he first grabbed the knife from his brother-in-law, he "grabbed it so they could see that [he] had a knife, for them to let [him] get away." If those three men had not threatened and "c[o]me at" him, he would not have removed the knife and he would have gone home. He did not want to stab anyone. When asked "[w]hy did you hold up the knife and stab?" he replied: "I was scared because they were going to kill me, so I was just trying to get them away from me."

¶ 64                                b. Cross

¶ 65        On cross, defendant testified that, although he had brought $600 with him on New Year's Eve in the hope of purchasing a vehicle from his hosts, they

_____

[13] That location was where Willie Sanchez lived in the front house and Javier Cahue lived in the rear coach house.

began talking and completely forgot about the vehicle. Defendant admitted that he stabbed his brother-in-law on February 9, 2008. After defendant was attacked on January 1, 2008, he was not angry but scared and thankful that he was able to escape. Although his brother told him not to call the police since it would anger the gang members, defendant believed "it would be a good thing for them to be arrested because [he] live[d] in the area." On February 9, 2008, which was a Saturday, defendant was at home watching television with his children and he had four or five beers. His brother-in-law was also drinking.

¶ 66        Defendant testified that he had never viewed the videotape of his statements to the police or reviewed the transcript. When the police arrived on February 9, 2008, one of the first police officers asked defendant to enter the squad vehicle which he did. At that point, his brother-in-law and another man were laying on the ground, and defendant admitted at trial that he had stabbed both of those men. However, defendant did not inform the officer that he had stabbed those men, and he did not recall what he told the officer. After the fight, defendant had cuts on his hands, but he did not receive stitches and did not go to the hospital. Defendant did not know whether he stabbed Jesus Sanchez, who was one of the men who had previously beaten defendant on January 1, 2008. Defendant did not observe anyone else with a weapon in the gangway on February 9, 2008, because "it was too dark." However, when he was leaving to

25

head to his home, someone hit him "really hard" on his back and he did not know what he was hit with.

¶ 67 Defendant testified that, when his brother-in-law was standing in the gangway, defendant "was going home, but he turned around to get [his brother-in-law] because [he] didn't want to leave him there." Defendant had walked away but he came back and "tried to pull" his brother-in-law "but he was too heavy." The brother-in-law had the knife "inside his pants at the waist." They had "that knife at home to cut tomatoes or chili's [*sic*] or anything." When the three men first approached, defendant was holding on to his brother-in-law's jacket and the three men were running toward them. When he was asked whether he grabbed the knife before or after the three men started beating him, defendant stated before:

"ASA: Did you start getting beat up before or after you grabbed the knife from Ramiro's waistband?

DEFENDANT: The second before I grabbed it.

ASA: They started hitting you beforehand?

DEFENDANT: Yes."

¶ 68 When defendant was asked why Ramiro did not reach for his own knife, defendant replied that his brother-in-law was "very high." Although defendant did not observe him using drugs that day, defendant testified that

26

"[h]e liked to smoke a lot of weed and did cocaine" but he always went outside to do it. After the three men started beating defendant, defendant felt "all the blows from everywhere" and he did not "know which one was hitting me where." The first blow landed on defendant's head. Defendant admitted that he stabbed one of the men in the chest:

"ASA: Where did you stab the guy that passed you first, what part of his body did you stab him?

DEFENDANT: I think in his chest because I pushed him.[14]

ASA: When you say you pushed him, did you push the knife into his chest?

DEFENDANT: Yes, I had the knife in my hands and I was pushing him and I was moving and I was swinging and I was pushing them away."

¶ 69　　　　On cross, the State played an audiotape of a 911 call but defendant could not identify his voice on the tape.[15] Defendant admitted telling the detectives: that "Ramiro was gone for six or seven minutes, and then he came

_____

[14] In a stipulation, the parties agreed that the medical examiner who performed the autopsy on Villagrana would testify that Villagrana received a stab wound to the chest.

[15] Both parties agreed that the translation and transcript of the 911 call was not accurate.

27

and told [defendant] to call the police"; that defendant had cuts on his hands from cutting an apple in the morning and working in a butcher shop; that Ramiro had the knife tucked inside his sleeve; and that the men had threatened defendant's life and to burn his house. However, defendant testified that he was "saying anything" because he had been threatened and he was very scared. Defendant recalled that, after a lineup, the police informed him that his jacket had been found by the door of his house. Defendant testified that he always left his jacket there, that it was his work jacket and that he always threw it under the stairs because it was always dirty.

¶ 70 Defendant admitted that he mistakenly told the police that the first time he was beaten was on Thanksgiving rather than New Year's Eve:

"ASA: By the way, when you were talking to the Detectives about the time that you had gotten beaten up before, you told them it happened on Thanksgiving Day, not New Year's Day?

DEFENDANT: Yes.

ASA: And that was just a mistake?

DEFENDANT: I don't really have any kind of education. I don't really know about dates, but dinner is a dinner." [16]

---

[16] Defendant had previously testified that he had his birthdate tattoed on his hand: "[b]ecause I don't know about letters or numbers and I forget."

¶ 71    The State also asked defendant about his interview at 3:15 p.m. with an assistant State's attorney (ASA) and Detective Jose Garcia. Defendant admitted that he told them that he had been drinking with his brother-in-law and had finished almost five beers, and that one of the men said he was going to kill defendant. The State then asked defendant about an interview later in the afternoon[17] with Detective Jose Garcia and another ASA. Defendant admitted stating that the first two men who came at him did not have anything in their hands.

¶ 72                          6. Heriberto Orozco

¶ 73    Defendant's next witness was Heriberto Orozco who testified that, on December 13, 2010, at 9:30 p.m. he was at the home of his girlfriend, Marisol Sanchez, the sister of Jesus Sanchez. Jesus was there with his girlfriend Leslie Brown. Orozco observed Jesus and Brown arguing and rolling around in the snow outside, which Orozco described as fighting. When Orozco separated them, Jesus pushed Orozco away and punched Brown in the face. The police were called, and Jesus was arrested. Orozco did not know the outcome of the case.

---

[17] The ASA in court stated that the interview was "at about 5:30 p.m. in the afternoon" but then the subsequent times given, which are all in 24-hour time, are shortly after 3:30 p.m.

¶ 74                    7. Chicago Police Officer Benjamin Martinez

¶ 75          Chicago police officer Benjamin Martinez testified that, shortly after midnight on January 26, 2013, he arrested Jesus Sanchez, who was standing with several other people outside the K'Oz Nightclub near 3551 West 25th Street, Chicago. They were flashing gang signs and yelling gang slogans at the patrons of the club.  Specifically, Jesus was yelling:  "Raza killer, SD killer, Two Six Killer and Ambrose killer."

¶ 76                      8. Chicago Police Officer Mario Uribe

¶ 77          Chicago police officer Mario Uribe testified that he interviewed Javier Cahue at Mt. Sinai Hospital on February 9, 2008. at sometime after 11 p.m. about a stabbing.

¶ 78          First, Uribe responded yes when asked by defense counsel if Cahue stated that "he, Javier Cahue grabbed at the offender's neck to stop him and in the process stabbed the victim," and that Cahue "grabbed the person with the knife, who then stabbed the second man who the offender had come to the scene with."  This testimony left the impression that Cahue admitted to stabbing a victim.

¶ 79          However on cross, Uribe testified that Cahue stated that defendant stabbed everyone in the gangway.  Uribe responded yes when asked by the

ASA if Cahue stated that "the offender approached Cahue with another man, male Hispanic, and started to stab Sanchez and another victim and the victim, Cahue" and that "the offender also stabbed the male Hispanic that came with him." Uribe testified that Cahue was being treated by the hospital staff as Uribe spoke with him.

¶ 80        The trial court then asked questions in order to clarify the testimony. Uribe agreed that Cahue had told him that Cahue grabbed the offender's neck. Then the court asked what "happened as a result or after he grabbed the offender's neck?" Uribe replied: "Cahue said the offender stabbed Sanchez in the back and that he cut Cahue's hands with his knife. I guess he was trying to wrestle the knife away from him, and then he – the offender stabbed the other unknown man he came with."

¶ 81                    9. Stipulations

¶ 82        The defense read three stipulations between the parties regarding Willie and Jesus Sanchez.

¶ 83        In the first stipulation, which was labeled Defense Exhibt No. 43, the parties stipulated that an ASA would testify that on February 11, 2008, at 4:50 p.m. he interviewed Willie Sanchez; and that Willie Sanchez's oral statement was memorialized in a written statement which Willie Sanchez signed on every page. The statement recited, among other things, that "Willie states that he,

Willie, was pretty high and drunk from cocaine, so he was just laying back," and "Willie states that Ignacio was then thrown out of the apartment." The stipulation did not provide a further context for these remarks.

¶ 84     In the second stipulation which was labeled Defense Exhibit No. 44, the parties stipulated that, if the court reporter for the grand jury proceeding on February 20, 2008, was called to testify, he would state that Willie Sanchez was asked the following questions and provided the following answers:

"ASA:  Do you see anybody on the street at that point that you invite into the party?

WILLIE SANCHEZ:  Yes, ma'am. Ignacio.

ASA:  Had you ever seen this person named Ignacio before?

WILLIE SANCHEZ:  No, ma'am."

¶ 85     The third stipulation, Defense Exhibit No. 45 stated that, if an investigator with the public defender's office was called to testify, she would state that she interviewed Willie Sanchez on June 2, 2011, in the kitchen of his parents' home and he stated " that Ignacio, the guy with the beer, was not a gang member," "that he and his friends were so mad that they beat the guy with their fists and bottles," and "that the beating started upstairs, and they continued to beat him all the way downstairs and outside."

¶ 86    The fourth stipulation, stated that, if Edith Sanchez were called to testify, she would state that she called the police on December 24, 2012, because her brother, Jesus Sanchez, came home drunk and started arguing with her, and placed his hands on her in an offensive manner and pushed her into a tree causing her pain.

¶ 87    After the stipulations, the defense rested and the State began its rebuttal case.

¶ 88                    C. The State's Rebuttal Case

¶ 89    The State's rebuttal case consisted mainly of the introduction of statements made by defendant to police.

¶ 90                    1. Detectives Matias and Swiderik

¶ 91    Prior to introducing the statements, the State called Detective Christopher Matias who testified: that he spoke Spanish, that he interacted intermittently with defendant from 4:30 a.m. to 4:15 p.m. on February 10, 2008: that he acted as a translator for defendant during certain procedures such as obtaining buccal swabs and photographs; and that neither he nor other officers in Matia's presence threatened to place a hand on defendant's behind. The State then recalled Detective Gregory Swiderik who testified: that his first interview of defendant began at 4:30 a.m. at Area 4 and was not recorded; that, at 6 a.m., defendant was taken into a recorded interview room; that defendant was there

until 4:15 p.m. and all the interviews between 6 a.m. and 4:15 p.m. were recorded; that Detective Garcia translated the interviews at 4:30 a.m. and 6 a.m.; and that Detectives Matias and Garcia were the only officers who translated for defendant at Area 4.

¶ 92                    2. Stipulation Re: Videotape

¶ 93        The State then read a stipulation between the parties that People's Exhibit No. 66 was an accurate two-hour video recording of the interviews of defendant on February 10, 2008, including: (1) two interviews conducted by Detectives Swiderek and Garcia; and (2) a third interview conducted by an ASA starting at 3:13 p.m. The parties also stipulated that People's Exhibit No. 67 is a 143-page English translation and transcript of the video.

¶ 94                    3. Sergeant Jose Garcia

¶ 95        Sergeant Jose Garcia testified that he is fluent in English and Spanish, and that he acted as a translator for defendant during the interview which began at 4:30 a.m. and lasted 20 minutes. At that time, the police did not consider defendant to be in custody and regarded him as a witness. During that interview, defendant stated that his brother-in-law entered a gangway and exited after sustaining injuries but defendant did not state whether he observed the person who stabbed his brother. Defendant stated that he did not know how

Rafael Villagrana was stabbed; that he (defendant) never entered the gangway; that two men ran out of the gangway and entered a black Blazer-type vehicle.

¶ 96 Garcia testified that, after this interview, he left Area 4 and returned to the crime scene. After discovering the knife in the yard north of defendant's home, Garcia returned to Area 4 at 5:40 p.m. and defendant was moved into a recorded interview room. Neither Garcia nor any officer in Garcia's presence threatened to place his hand in defendant's behind. Garcia had listened to the 911 tape in this case and recognized the voice as defendant's voice.

¶ 97 Next Garcia testified about the substance of the 911 tape. After the call was received, the call operator informed defendant that the operator did not speak Spanish and he placed defendant on hold waiting for a Spanish speaker. Then defendant said that he hit Ramiro and swore. When a Spanish-speaking operator came on the line, defendant asked for an ambulance because a man was hurt. Defendant stated that they "got into a fight with some gangbangers" and the gangbangers hit Ramiro. Then defendant stated there were three injured men. The Spanish interpreter stated that "two gangs fought and he got stabbed," but Garcia believed that interpretation was incorrect.

¶ 98 On cross, Garcia testified that he did not take any notes during the first interview at 4:30 a.m. that he did not write a report about it, and that if any notes were taken, that would have been done by Detective Swiderek.

¶ 99    The State then marked the 911 tape as People's Exhibit No. 68, and it was admitted into evidence.

¶ 100                    4. The Videotape

¶ 101   After Garcia testified, the judge stated that they would adjourn for the day, and he would review the videotape and the transcript before the parties returned to argue the case on another day. When court resumed, the judge stated:

"the State had requested that I review with the Defense agreement, portions of the electronically recorded interrogation as specified on the sheet that the parties brought to my chambers the next day together. That was from 5:56 a.m. to 6:19 a.m. on February [10]th, from 6:32 a.m. to 7:35 on the same date and from 3:13 p.m. to 6 – it should be to 3:39 p.m. on the same date. I've reviewed that.

I've also reviewed the transcript that the parties jointly presented to the Court. I've reviewed those portions of the ERI and the transcripts, neither more nor less."

¶ 102   The parties had previously stipulated on the record that People's Exhibit No. 66 was an accurate video recording of interviews with defendant

and that People's Exhibit No. 67 was an accurate English translation and transcript of the video. [18]

¶ 103                                   a. First Interview

¶ 104        The first interview, which began at 5:56 a.m. on February 10, 2008, was conducted by Detective Swiderek with Detective Garcia acting as an interpreter.

¶ 105        At the start of that first interview, Detective Swiderek informed defendant that they were going to place him in a lineup, and defendant was read his *Miranda* rights. Detective Swiderek stated that he had showed defendant a photograph of Rafael Villagrana, one of the stabbing victims, and defendant responded that he did not know him and had "hardly seen him."

¶ 106        Defendant stated that his brother-in-law asked defendant to accompany him while his brother-in-law was going to "get" something but his brother-in-law did not specify what or where. Defendant left his home on South Drake, and followed behind his brother-in-law. As they walked, the brother-in-law instructed defendant to wait at a certain location, and the brother-in-law kept walking. After 10 minutes, the brother-in-law returned, again told defendant to

---

[18] The State's brief states that the transcript is also included in the common law record. However, the transcript in the common law record and the transcript labeled Exhibit No. 67 are not identical. Exhibit No. 67 contains corrections in pen to the translation which the transcript in the common law record lacks. We will rely on Exhibit No. 67.

wait, then walked two houses away, opened a gate and entered a gangway, walking toward the back of a house. This time defendant followed.

¶ 107    Defendant testified that it was the same place where defendant had been beaten up and robbed by three men on Thanksgiving Day.[19] Defendant had a scar from the incident and made a police report about it. The incident occurred in the front house on the property.

¶ 108    Defendant stated that, after his brother-in-law walked down the gangway a second time, defendant did not hear anything and then, six or seven minutes later, his brother-in-law came running out and grabbed defendant and told him to call the police. Defendant held his brother-in-law and laid him on the ground. Then defendant ran to his house and told his wife "they hit your brother." After retrieving an officer's phone number from his wallet, defendant called the officer who told him to call 911, which he did. Defendant told the 911 operator to send two ambulances for two or three people. After calling 911, defendant ran back to his brother-in-law and started lifting him up, but a police vehicle arrived and an officer instructed defendant not to do that.

¶ 109    Defendant stated, after the officer asked him what he was doing, defendant explained that the man was his brother-in-law and that defendant had

---

[19] Defendant testified that he mistakenly said Thanksgiving Day when he meant New Year's Day.

been with him earlier. The officer replied that defendant was an important witness and instructed him to enter the police vehicle, which defendant did.

¶ 110     Defendant stated that, after his brother-in-law ran out of the gangway, another man exited and was holding onto the fence. Then two men ran out, entered a black Blazer truck and departed. In the interview, Detective Swiderek asked defendant why he told the 911 operator there were two or three people injured. Defendant said that he "called fast" and said he needed "[t]wo – three." The detective also asked defendant how he had received the cuts that the detective observed on defendant's hands. Defendant replied: "This cut is from an apple I cut in the morning and this one is because I work at a butcher shop." When the defendant asked about the blood on his pants and shoes, defendant replied: "I don't know if it's from my brother-in-law."

¶ 111                    b. Second Interview

¶ 112     The second interview, which began at 6:32 a.m. and lasted approximately an hour, was conducted again by Detectives Swiderek and Garcia.

¶ 113     At the start of the second interview, they told defendant that he had been identified "as the guy that did this," and that "[y]our brother-in-law died for nothing." The detectives told him that now was his chance to explain himself, that he did not look like a bad person, but that if he did not explain himself he would look like a cold-blooded killer. The detectives also told him that a knife

had been found next to his house and a bloody jacket or sweatshirt outside his apartment door. The detectives said that they were going to take defendant's clothes and test the blood on them to see if it "c[a]me back to the people that got stabbed." The detectives told him that, if he did not explain himself, it "looks bad for" him.

¶ 114     The detectives then said that Ramiro was like his brother and asked: "You're going to let Ramiro die for nothing?" When defendant said "I never went all the way over there," Detective Swiderek replied "[y]eah he did" and "you could be looking at spending a lot of years in jail." The detective said they found the knife next to defendant's house because that is where defendant put it. When they asked about the black jacket, defendant replied that he wore a black jacket but he did not remember when he took it off. Detective Swiderek responded that defendant took it off because "those guys are dead" and it's got blood all over it." Defendant stated that he had the jacket on when he ran across the street to his house but he did not have it on when the police arrived.

¶ 115     The detectives then stated that the knife they found was "going to match these cuts" and it was found "next to [defendant's] house," and that it was "going to have blood on it from people that got stabbed." They repeated that, if defendant did not explain himself, he would "look like a cold-blooded killer," and they repeated several times that Ramiro was dead. Then Detective

Swiderek stated: "if you don't explain yourself you could be going away for a long time."

¶ 116     Detective Swiderek added: "You know those guys robbed and beat you. You were mad. Sometimes things happen. But you better explain yourself here. We have people that saw you. Picked you out. We have blood. There's blood on your hands. We have the knife. Next to your house. We don't think you're a bad guy. But sometimes things happen. And if you don't explain yourself, it looks like you went over there just to kill a whole bunch of people. *** Now is the time to explain yourself."

¶ 117     Detective Garcia, who was acting as the interpreter, then asked, independent of any question posed by Detective Swiderek, "why did Ramiro have to die? Did you kill him on purpose?" To which, defendant replied no.

¶ 118     Then Detective Swiderek continued: "Your friend, your brother. You know, Ignacio, things happen. We don't think you're a bad guy. You've never been in a lot of trouble. *** You know maybe you were drinking a little bit[,] things happen." Defendant replied: "Yes, I drank about four almost five beers."

¶ 119     Then Detective Garcia, not acting as an interpreter for Detective Swiderek, stated: "Alcohol makes you do things that later you regret. *** But things happen. You have to explain it. You have to explain it to him."

¶ 120    Detective Swiderek said that he would be mad too if someone robbed him and asked what they robbed defendant of. Defendant said $600 dollars. Detective Swiderek said "[o]kay[,] so maybe you just wanted to get your money back," but defendant replied no.

¶ 121    Then Detective Garcia, not acting as an interpreter, asked defendant several times why he went there with a knife.  Detective Swiderek then stated that they knew that defendant did not "want it to go this way," and added "[w]e told you these guys – some of these guys were in a gang, right?" Detective Swiderek said "if you don't want to explain yourself we have to go on – we have to go on with what other people are telling us. And they're not saying – They're not saying nice things."

¶ 122    Detective Garcia, not acting as an interpreter, stated:  "They're saying it occurred differently from what you're saying.  They're going to say how the story happened.  Here is your opportunity to tell us how you saw things happen. Explain how Ramiro died.  Did he die at your cold-blooded hand?  Did you assassinate him?  Then how did Ramiro die?  How is it that Ramiro died?  How did Ramiro die? Did you assassinate him? Did you kill him?  How did he die?"

¶ 123    Detective Garcia continued:  "How are you going to ask Ramiro's family for forgiveness, your own family?  How are you going to ask them for forgiveness for what happened to him?  Are you going to let them believe that

you cold-bloodedly killed him? *** Don't you want to ask them for forgiveness for what happened to Ramiro?" When defendant indicated yes, Detective Garcia stated: "Then explain to us how it happened."

¶ 124        Then defendant stated: "We came out of the house. He tells me accompany me brother-in-law. Weeks before he had mentioned that he wanted to get an ID." Defendant stated that Ramiro "was very upset because he said he wasn't interested in anything in life. *** Because his father doesn't love him." When Detective Garcia asked what that had to do with "going with the guys about an ID," defendant replied: "They also took money from him." When they arrived at the house, his brother-in-law told defendant to wait, and then the brother-in-law left and returned and said "come on dude let's go f*** them up." Ramiro was carrying a small knife with a red handle, and defendant told him no and tried to take the knife from him. But defendant was not able to take the knife, so defendant went after him. When they arrived at the gangway to the house, two men were coming toward them, and his brother-in-law pushed him away. Defendant stated: "Then he took the knife and the guy yelled. One of the guys yelled and he took – I didn't know if he had hit him or not." In the prior quote, it is not clear who "he" is but "he" seems to refer to the brother-in-law and "him" seems to refer to one of the three men. Then defendant stated: "I just heard him say paisa I don't want to die paisa."

¶ 125    Defendant then stated: "Then when I saw him coming back – He didn't have the knife anymore.  He was coming back without anything.  He was coming back with his hand like this.  I don't remember if it was this hand.  Then I grabbed him and brought him back and let him go there on the sidewalk.  I went back.  The knife was just thrown on the ground and a fat guy went running towards the other side.  I think – I'm not sure what happened.  I then grabbed the knife and went to get my brother-in-law and I took him out of there.  I then let him go and went outside to a make a call" by phone.  The "him" and "he" at the start of this quote appear to refer to his brother-in-law.

¶ 126    Defendant stated that he left running, threw away the knife, threw down the jacket and called the police. Detective Garcia told him that what he related was "not possible," that defendant was "not telling [them] something" and that he had to tell them "the whole truth."  Detective Garcia added: "the only thing that is going to help you is the truth.  I know you're scared.   I know you didn't plan this."  Detective Swiderk told him:  "The witnesses have you Ignacio with the knife."  Then the detectives stated:

"DETECTIVE SWIDEREK:  Don't do that to him.

DETECTIVE GARCIA:  Don't do Ramiro like that.  Don't blame him.

DETECTIVE SWIDEREK:  You don't want to disgrace him.

DETECTIVE GARCIA: You don't want to disgrace him. You don't want him to take the blame for that disgrace. No, right.

DETECTIVE SWIDEREK: The witnesses have the knife in your hand."

¶ 127    Then defendant stated that when he went with Ramiro, he did not know what Ramiro was going to do, and that he did not do the stabbing. Then the police argued with defendant that defendant was the one who was robbed, that Ramiro did not have a problem with these men; and that defendant was "the one with the problem." Detective Swiderek stated: "There was one knife out there and your brother was stabbed, an accident. And you stabbed him. It was an accident. It was an accident. It was an accident yes. Yes – yeah – yeah. Well guess what? If it wasn't then you're going to go down as a cold-blooded killer of your own brother-in-law. 'Cause everybody's got the knife in your hands."

¶ 128    Detective Swiderek then stated: "The knife has your fingerprints on it." Both detectives then repeated a number of times that defendant could not blame Ramiro. Defendant then explained that Ramiro was mad because he gave these men money to obtain an ID but they never gave him the ID. The police then argued with him that he was the one who was robbed and beaten, and that the witnesses said that defendant had the knife not Ramiro. Defendant stated: "I

already explained myself. I already told you what happened." The police repeated several times that he should let Ramiro rest in peace.

¶ 129    Defendant then stated that the other men threatened to burn down defendant's house and Ramiro took the knife. Defendant then said, "When we got there" and Detective Garcia interrupted and said: "Hmm-hmm. When you got there – you took it? You took it from him?" Defendant then repeated: "I took it from him." Defendant stated that, when they entered the gangway, the men jumped on him and defendant grabbed the knife to defend himself. Defendant continued that, when the men passed by him, he turned around and "threw the hit" which accidentally hit his brother-in-law. Defendant stated that, when one of the other men came at him, defendant hit him, and that when one of the men grabbed him, he stabbed him.

¶ 130    The following exchange occurred:

"DETECTIVE GARCIA: So you think you that you stabbed two and then you accidentally stabbed your brother-in-law?

DETECTIVE GARCIA: Yes?

DETECTIVE SWIDEREK: Say yes.

DETECTIVE GARCIA: I'm sorry I don't hear you. You have to tell me –

DEFENDANT: Yes. "

¶ 131    Defendant stated that if the men had not thrown themselves on him, he wouldn't have done anything, and "I didn't want to hit anybody. I had the knife and I didn't mean to hit the chubby one" and "I didn't want to stick anyone." Defendant stated that Ramiro did not tell him that Ramiro had a knife until they arrived at the scene. Defendant did not see whether anyone else had a knife because it was dark. After defendant told the detectives that he did the stabbing, the detectives told him "[n]ow your brother can rest," and they offered him a soda.

¶ 132                          c. Third Interview

¶ 133    The third interview, which began at 3:13 p.m., was conducted by an ASA with Detective Jose Garcia acting as an interpreter. The ASA began by reading defendant his *Miranda* rights. When the ASA then asked defendant if he would like to relate what happened last night, Detective Garcia translated that as: "Do you want to tell him what happened yesterday? What you told us. What you told us."

¶ 134    Defendant then related: that his brother-in-law lives in defendant's home; that defendant was at home watching television and had consumed almost five beers; that his brother-in-law invited defendant to accompany him to obtain an ID; that the brother-in-law had already paid for the ID but had not received it; that they walked to the place where defendant had been previously beaten up;

that, when they arrived, his brother-in-law said that he wanted to teach them a lesson and that was when defendant first observed his brother-in-law with a knife; that defendant grabbed him and said "no—no—no"; that defendant continued to follow him saying no and they entered the gangway through a gate; that suddenly men appeared in the gangway; that one of the men recognized defendant, ran toward defendant and jumped him; that defendant then took the knife from his brother-in-law and defended himself with it; that a second man attacked defendant; that defendant turned around and accidentally stabbed his brother-in-law; that a "chubby" man grabbed the knife and said "don't kill me paisa"; that defendant replied that he did not want to hurt anyone and he did not "know what's going on with me"; that it was like defendant was "dizzy" and he "snapped out of it" when the chubby man grabbed defendant's hand; that the chubby man let defendant go; that defendant grabbed his brother-in-law and left and laid him on the sidewalk; that his brother-in-law told him to call the police; that defendant ran towards his house and threw the knife away; that when he arrived at his house, he took off his jacket and called an officer who stated that he could not attend to him and to call 911; that defendant called 911 and requested an ambulance for 2 or 3 people.

¶ 135    When the ASA asked defendant when he was beaten up, defendant replied "[i]t was on Thanksgivng Day or how do you say that?" and Detective

48

Garcia replied "Thanksgiving. On Thanksgiving" and defendant agreed with him. When the ASA asked "[n]ot New Year's Eve," defendant replied that "it was on the day of the dinner." Defendant stated on the day he was beaten, his brother-in-law later pointed to defendant's eye and asked what happened.

¶ 136     When the ASA asked defendant if he had stabbed the first man in the chest, defendant responded he did not see the area where the man was hurt. Then Detective Garcia stated "you told us you *** stabbed him more or less right around" here and that defendant should show the ASA where, which he did. Defendant stated that he did not know if he cut the second man. Defendant also related that he worked at Sam's assembling boxes to pack meat.

¶ 137     As stated above, after watching the videotape and reading the transcript of the three interviews, the court proceeded to oral argument and then verdict.

¶ 138                    II. Conviction and Sentence

¶ 139     The trial court found defendant guilty of first-degree murder and two counts of aggravated battery, and rejected defendant's claims of self-defense and second-degree murder predicated on imperfect self-defense The presentence report indicated that defendant was 34 years old, with no gang affiliation and only one conviction for driving while intoxicated. A psychological evaluation concluded that defendant had "mild mental retardation."

¶ 140    After hearing factors in mitigation and aggravation, the trial court sentenced defendant on November 21, 2013, to a total of 32 years with the Illinois Department of Corrections. The sentence included 30 years for the first-degree murder, and 2 years for each aggravated battery, with the aggravated battery sentences to run concurrently to each other but consecutively to the murder sentence. This appeal followed.

¶ 141                                    ANALYSIS

¶ 142    On this direct appeal, defendant asks this court to reduce his murder conviction to second-degree murder, arguing that he proved by a preponderance of the evidence a mitigating factor, namely, that he had an actual, although unreasonable, belief in the need to act with deadly force to defend himself and another. 720 ILCS 5/9-2(a)(2) (West 2008). For the following reasons, we affirm.

¶ 143                            I. Standard of Review

¶ 144    "The question of whether a defendant's actions were committed under mitigating circumstances—here, the question of whether defendant unreasonably believed that circumstances justifying the use of lethal force were present—presentd a question of fact." *People v. Romero*, 387 Ill. App. 3d 954, 967-68 (2008). In the case at bar, the trial court found that the mitigating factor was not present. "In an appeal challenging a factual determination that

no mitigating factor was present, the question presented is *** whether the fact finder correctly concluded that the defendant did not prove the existence of a mitigating factor by a preponderance of the evidence." *Romero*, 387 Ill. App. 3d at 967. When a trial court determines that the defendant failed to prove the presence of a mitigating factor by a preponderance of the evidence, the reviewing court will not reverse if it determines that "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996).

¶ 145    In a bench trial, the responsibility of weighing the credibility of the witnesses rests with the trial court. *People v. Coleman*, 301 Ill. App. 3d 37, 42 (1998). "This court will not substitute its judgment for that of the trial court on questions involving the credibility of witnesses." *In re Jessica M.*, 399 Ill. App. 3d 730, 738 (2010). A trial court's decision to believe one witness's account of an attack over another "is virtually unassailable on appeal." *In re Jessica M.*, 399 Ill. App. 3d at 738.

¶ 146    "[T]his deference does not require a mindless rubber stamp on every bench trial guilty verdict we address." *People v. Hernandez*, 312 Ill. App. 3d 1032, 1037 (2000). The trial judge must "consider all the evidence presented in determining the matter before it," and a reviewing court will review the record

to ensure this was done. *People v. Mitchell*, 152 Ill. 2d 274, 322 (1992). A "trial court's failure to recall and consider testimony crucial to defendant's defense result[s] in a denial of defendant's due process rights." *Mitchell*, 152 Ill. 2d at 323. Likewise, "[a]lthough the trial court's findings of fact are given great weight, they are not conclusive where *** the finding is unsupported by the testimony given at trial." *People v. Jones*, 404 Ill. App. 3d 734, 746 (2010).

¶ 147                          II. Imperfect Self-Defense

¶ 148          Section 9-2 of the Criminal Code of 1961provides for two forms of second-degree murder, the second of which occurs when: "[a]t the time of the killing [defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable." 720 ILCS 5/9-2 (West 2008). This second form of second-degree murder is known as imperfect self-defense, and "occurs when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995).

¶ 149          Self-defense consists of six factors: "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied,

and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35. To sustain a charge of first-degree murder after the defendant raises the issue of self-defense, the State must prove beyond a reasonable doubt that at least one of the six factors was not present. *Jeffries*, 164 Ill. 2d at 128. However, to be found guilty of second-degree murder, *the defendant* must prove by a preponderance of the evidence that all of the first five factors were present. *Jeffries*, 164 Ill. 2d at 129.

¶ 150                                    III. Burden of Proof

¶ 151        Defendant argues that his conviction for first-degree murder should be reduced to second-degree murder because he proved, by a preponderance of the evidence, that he had an actual, but unreasonable, belief in the need to act with deadly force for self-defense.

¶ 152        Section 9-1 of the Criminal Code defines the offense of first-degree murder, in pertinent part:

> "(a) A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death:
>
>> (1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or

53

(2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1 (West 2008).

¶ 153       Section 9-2 of the Criminal Code defines the offense of second degree murder, in pertinent part, as follows:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) section 9-1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed ***; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of

this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code."  720 ILCS 5/9-2 (West 2008).

"[T]he elements of first degree and second degree murder are identical, and it is the presence of statutory mitigating factors that reduces an unlawful homicide from first degree to second degree murder."  *People v. Thompson*, 354 Ill. App. 3d 579, 587 (2004).

¶ 154      "[T]he second degree murder statute requires the State to prove, beyond a reasonable doubt, each element of first degree murder before the burden shifts to the defendant to prove, by a preponderance of the evidence, any of the factors in mitigation that must be present to reduce the offense from first degree to second degree murder."  *Thompson*, 354 Ill. App. 3d at 586.  This court has held that, once the defendant proves a mitigating factor by a preponderance of the evidence, the State has a burden to disprove it beyond a reasonable doubt.

*Thompson*, 354 Ill. App. 3d at 586 ("Once the defendant carries his burden of proving any of the factors in mitigation, the burden shifts back to the State to prove the absence of the implicated mitigating factors beyond a reasonable doubt."); *People v. Golden*, 244 Ill. App. 3d 908, 919 (1993) (If defendant presents mitigating evidence "the State must disprove those factors beyond a reasonable doubt."). In *People v. Buckner*, 203 Ill. App. 3d 525 (1990), the court explained that "the second-degree murder statute functions as a defense against the first-degree murder charge, which the State is still required to prove *before* the trier of fact considers whether the mitigating factors were shown by a preponderance and, if it so finds, the State must disprove such factor(s) by proof beyond a reasonable doubt." (Emphasis in original.) *Buckner*, 203 Ill. App. 3d at 533-34.

¶ 155    However, the Second District has held that "[t]hese cases misstate the law" and "Illinois's statutory scheme nowhere provides that the State must disprove a mitigating factor beyond a reasonable doubt after a defendant has established a mitigating factor by a preponderance of the evidence." *People v. Romero*, 387 Ill. App. 3d 954, 966 (2008). In the 1980's, shortly after the Criminal Code was amended to replace the offence of voluntary manslaughter with the offence of second-degree murder, the Illinois Supreme Court held that "the new Act not only requires the defendant to come forward with *some*

evidence of a factor in mitigation; it requires the defendant to prove, *by a preponderance of the evidence*, a factor in mitigation. Furthermore, the State is no longer required to prove, beyond a reasonable doubt, the absence of the factor in mitigation." (Emphasis in original.) *People v. Shumpert*, 126 Ill. 2d 344, 352 (1989). See also *People v. Simon*, 2011 IL App (1st) 091197, ¶ 51 ("The State is not required to prove the absence of the mitigating factor beyond a reasonable doubt.").[20]

¶ 156     In the case at bar, defendant argues that the State failed to disprove the mitigating factor beyond a reasonable doubt, and the State argues that it did. However, we need not resolve the issue of whether this is required — an issue that is not addressed by the parties — because the factfinder stated that he did not find defendant credible and thus defendant failed to satisfy his initial burden of proving the mitigating factor by a preponderance of the evidence.

¶ 157     First, the State satisfied its burden of proving defendant guilty of first-degree murder beyond a reasonable doubt, a fact that defendant does not dispute on appeal. The State satisfied this burden by calling Javier Cahoe, one of the survivors of the brawl, as well as other witnesses. Then, defendant attempted to satisfy his preponderance burden by calling several witnesses including himself. Like Cahoe, defendant was one of the survivors of the event.

---

[20] The issue of burden of proof was not briefed by the parties in *Simon*, and was not dispositive to this court's holding in that case.

¶ 158    However, defendant failed in his attempt to satisfy his preponderance burden because the trial court found: "I simply don't believe his testimony. I do not believe the changing circumstances of those statements to the police." For example, Officer Sanchez, who was the first officer to arrive at the scene, testified that defendant claimed he was merely standing on the sidewalk when four men, including his brother-in-law, ran out of the gangway, all injured. Even defendant admitted at trial that he lied to the police at first, claiming that an unidentified officer threatened him, and that he told the truth only later. By contrast, the trial court "conclude[d] that Cahoe was testifying credibly." After listening to defendant's own admittedly conflicting statements, the trial court concluded that defendant "did not act out of any belief, even unreasonable, that self-defense was necessary that would lead to him being found guilty of second-degree murder." Since the trial court found that defendant failed in his attempt to satisfy his initial preponderance-of-the-evidence burden, we will analyze below whether any rational trier of fact could have reached the same conclusion. *Blackwell*, 171 Ill. 2d at 357.

¶ 159                    IV. Any Rational Trier of Fact

¶ 160    As we stated earlier, the burden was on defendant to prove by a preponderance of the evidence the following five factors: "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of

harm was imminent, (4) the threatened force was unlawful, [and] (5) the person actually and subjectively believed a danger existed that required the use of the force applied." *Washington*, 2012 IL 110283, ¶ 35 (listing the factors of self-defense); *Jeffries*, 164 Ill. 2d at 129 (burden is on defendant to prove by a preponderance). We must affirm if "any rational trier of fact" could have found that defendant failed to prove any one of these factors by a preponderance. *Blackwell*, 171 Ill. 2d at 357.

¶ 161    Our review of the record shows that a rational trier of fact could have found that defendant failed to prove by a preponderance that he was not the aggressor. Defendant testified that he and his brother-in-law walked to the same house where defendant had been previously beaten, and his brother-in-law showed defendant a knife and stated that he would "teach them a lesson." Defendant testified that he had an opportunity to leave at that point but decided to remain. According to defendant's own testimony, if defendant had not grabbed the knife from his brother-in-law when the three men approached, then the resulting fight would have been a fist fight of two men against three men. The medical examiner testified that the murder victim, Rafael Villagrana, died of multiple stab wounds, and defendant's own testimony indicated that no one succeeded in taking the knife from defendant during the fight and no one else had a knife. Defendant admitted that he stabbed both of the men who died, both

Villagrana and his brother-in-law. Based on defendant's own testimony alone, a rational trier of fact could have concluded that defendant failed to show by a preponderance of the evidence that he was not the agressor.

¶ 162    In reaching this conclusion, we do not overlook defendant's assertion that he was threatened by the police and that, after being threatened by them, he would "say[] anything." Defendant testified that the police threatened him with 70 to 80 years in jail if he did not talk to them, a claim that none of the officers denied when they testified. The officers denied that they threatened to place a hand in his behind, but they did not address this other threat, of decades in jail. Defendant's assertion of this second threat finds support in the transcript of the second interview where the detective, who was in charge of the questioning, told defendant "if you don't explain yourself you could be going away for a long time" and where the detective who acted as a Spanish interpreter told defendant: "You have to explain it to [the other detective]." Statements like these contradict and undercut the *Miranda* warnings which defendant received at the start of the first interview and should not be encouraged. However, no issue with respect to the statements is raised on appeal, and the trial judge read the transcript and took these statements into consideration when making his credibility determination of defendant whom he had the opportunity to observe in person — an opportunity which we lack.

¶ 163        Based on our careful and detailed review of the record, we cannot conclude that no rational trier of fact could have found as the trial court did with respect to the second degree murder charge, and thus we must affirm.

¶ 164                        CONCLUSION

¶ 165        For the foregoing reasons, we affirm defendant's conviction and sentence on this direct appeal.

¶ 166        Affirmed.