2021 IL App (1st) 190820-U

No. 1-19-0820

Order filed March 30, 2021.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 9746 |
| | ) | |
| ROMELL OUTLAW, | ) | The Honorable |
| | ) | Nicholas R. Ford, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm (1) defendant's conviction for second degree murder over his contention that the State failed to disprove his claim of self-defense, and (2) his sentence over his contention the trial court considered an "irrelevant" factor at sentencing and failed to weigh two mitigating factors.

¶ 2    Following a bench trial, defendant Romell Outlaw was convicted of second degree murder

(720 ILCS 5/9-2(a)(2) (West 2014)) and sentenced to a term of 18 years' imprisonment. On appeal,

defendant contends (1) the evidence was insufficient to prove him guilty beyond a reasonable

doubt and (2) at sentencing, the trial court considered an "irrelevant factor" and failed to consider two statutory mitigating factors. For the following reasons, we affirm.

¶ 3 The State charged defendant with 14 counts, but nol-prossed four of them. It proceeded to trial on nine counts of first degree murder and one count of aggravated discharge of a firearm in connection to the April 2, 2015, shooting death of Juan Simpson. The first degree murder counts alleged defendant, without lawful justification, either intentionally or knowing that such act created a strong probability of death or great bodily harm or during the commission of an aggravated discharge of a firearm forcible felony, shot and killed Simpson (counts I, II, III), shot and killed Simpson by personally discharging a firearm (counts V, VI, VII), and shot and killed Simpson by personally discharging a firearm that proximately caused death (counts IX, X, XI). The defense theory of the case was that defendant shot Simpson in self-defense. As defendant does not contest he shot and killed Simpson, we recite only the facts necessary to resolve this appeal.

¶ 4 Larry McGhee testified he had a prior conviction for aggravated unlawful use of a weapon. He had known Simpson all his life. On April 2, 2015, around 8:30 p.m., McGhee was standing with friends outside Fair Food Mart on the corner of 69th Street and Indiana Avenue. While outside, he heard "a lot of arguing going on" and recognized the voice of someone named "Rell," whom he knew "[f]rom the neighborhood."[1] Upon hearing the argument, McGhee walked away toward Indiana and 71st Street. Shortly thereafter, McGhee returned and observed Rell exiting the store and arguing with an unknown man, whom McGhee identified in court as defendant. Defendant walked with a woman on 69th Street near a vacant lot. Rell then stood at the corner of the store with "a lot of people from the community." Simpson had walked up from a porch and

_____

[1]Rell's last name is not included in the record.

was "standing there drinking." McGhee heard the gunshots and saw "the fire from the gun," which came from defendant's direction. Rell had been nearby but was not shooting a gun. After hearing gunshots, McGhee "took cover" on the side of the store until the shots stopped. He then ran toward the corner where everyone else was running. McGhee observed Simpson lying in the street. He called 911 and then went home. Aside from defendant, no one else had a gun that night.

¶ 5    The State published a video clip from the Fair Food Mart, depicting three camera angles synced to the same time. The parties stipulated the time stamp on the video was an hour behind. McGhee narrated portions of the video.

¶ 6    The video shows men inside the food mart. At 7:25 p.m., a man in a black hoodie and a woman enter the store. A second man, whom McGhee identified as Rell, walks through the doorway immediately after. The video shows Rell yelling at the man in the hoodie and waving his arms. Several other men in the store are shown standing in between Rell and the man in the hoodie. After the man in the hoodie pays, he and the woman exit the store. Rell and the man in the hoodie pause and stand in front of each other. The woman then grabs the man in the hoodie's arm and prompts him to continue walking out of the store. After they walk outside, Rell and several other men follow.

¶ 7    The camera angle outside the store shows a blurry video of a group of people on the corner of the street. Two individuals are shown walking away from the group on the street. Then a person in a white shirt and several other people follow in the direction of the two individuals. McGhee identified Simpson as one of the people shown walking on the sidewalk outside the store and, several seconds later, as running. The video subsequently shows all of the people standing on corner running.

¶ 8 On cross-examination, McGhee testified Rell had been drinking outside the store. McGhee knew Simpson went by "White Boy" but did not know whether he was a gang member. However, McGhee acknowledged that in May 2015, he informed detectives he knew Simpson and Rell because they were all members of the Black Stone gang. He further acknowledged gang members are "supposed" to back each other up. McGhee informed the detectives that defendant and Rell "exchanged words" but Rell was the only one yelling. Rell yelled, "[o]n the Stones, you a b***," which McGhee could hear from outside the store.

¶ 9 There were approximately 10 people outside the store when defendant exited. McGhee saw a man in braids and a white shirt, whom he knew "from the area," follow defendant and wave his arms at him. Simpson and Rell also followed defendant and walked into the middle of the street. McGhee was unaware of whether Simpson had his hand in his pocket. McGhee acknowledged that defendant and his girlfriend were trying to leave and there were people following him.

¶ 10 On redirect, McGhee testified Rell and Simpson did not have a gun "out there," and defendant was the only person who fired a gun. On recross, McGhee stated the only people "following anybody were [his] three buddies" and all defendant and the woman were trying to do was "leave."

¶ 11 Omar Ahmed testified he had a pending charge for "continuing financial crime enterprise theft" but had not received "any deals" in exchange for his testimony. Ahmed was the manager at Fair Food Market in April 2015. Ahmed knew Simpson as a "regular in the neighborhood." At around 8:30 p.m. on the night of the shooting, Ahmed was in the back of the store and heard an argument by the cash area. He yelled for everyone to leave and followed everyone as they walked outside.

¶ 12     Once outside, Ahmed was waiting for the crowd to disperse. He saw a man and woman cross the street and some men walk to the corner. The man and woman stood in the middle of a vacant lot across the street. At some point, Ahmed observed the man in the lot, whom he identified in court as defendant, with a gun. Ahmed saw "flashes" and everyone ran. He heard "a lot" of gunshots but could not count how many because he was running back to the store. He later learned Simpson died. Ahmed identified himself in the store video. He did not see anyone other than defendant with a gun that night.

¶ 13     On cross-examination, Ahmed testified he could not specifically recall testifying before the grand jury that, while waiting outside the store, the crowd was "waiting for something to happen, a fight, anything. You know how it is, everybody walks around. They got cameras. They want to tape them." He could not recall whether anyone was recording that night. The store had a security guard, who was shown in the video. On the night of the shooting, there were approximately seven gang members outside the store. When defendant entered the store, he attracted the attention of the gang members. After defendant left the store and crossed the street, Simpson also crossed the street. When the shots were fired, defendant and his girlfriend were in the middle of the vacant lot. Ahmed identified a photograph of the lot. He did not call the police until after the shooting.

¶ 14     Chicago police officer Nino Macias testified that, on April 2, 2015, he and Officer Mulligan responded to a call at 69th and Indiana. There Macias observed a crowd and an unresponsive man, later identified as Simpson, on the ground. He learned Simpson had been shot in the lower, right side of his back. Macias and Mulligan canvassed the lot and found nine expended shell cases.

¶ 15    The parties stipulated that if called, Chicago police detective Abdalla Abuzant would testify he was an evidence technician on the day of the shooting and recovered nine cartridge cases in various parts of the vacant lot. The cartridge cases indicated that a semiautomatic gun was used because that type of weapon discharges cartridge cases when bullets are fired.  The parties also stipulated that, if called, Chicago police officer Barry Earls, a firearms examiner in the Chicago Firearms Lab, examined the recovered cartridge casings and determined they were all fired from the same firearm, capable of firing 9-milimeter Luger ammunition.

¶ 16    The parties further stipulated that, if called, forensic pathologist and deputy medical examiner Dr. Denika Means performed the autopsy on Simpson and observed "a gunshot to the trunk and abrasions on the left hip, left elbow, and left forearm." Dr. Means recovered a medium caliber bullet from Simpson's abdomen and found no evidence of close-range firing. In Dr. Means' opinion, Simpson died as a result of a gunshot wound to the trunk, and the manner of death was homicide.

¶ 17    The court granted the defense motion for a directed finding on counts III, VII, and XI, which alleged defendant committed the first degree murder of Simpson during the commission of a forcible felony, namely, aggravated discharge of a firearm at McGhee. The court also granted a directed finding for defendant on count XIII, which charged him with aggravated discharge of a firearm toward McGhee.

¶ 18    Miesha Averhart testified she had a daughter with defendant. At the time of the shooting, she lived with defendant, their daughter, and her mother. On April 2, 2015, defendant and Averhart walked to Fair Food Mart just before 8:30 p.m. There were men "hanging out" along the side and front of the store. When Averhart and defendant entered the store, an unknown man followed them

inside. Defendant approached the counter and the man "just started saying disrespectful things to [defendant]" such as "he's not from here, get the f*** out of here." Averhart was "[v]ery scared" when the man was yelling. Other people in the store at the time were standing around while the man yelled at defendant.

¶ 19 After defendant made a purchase, he and Averhart started to leave. The man who yelled and some of the other men in the store followed them outside. As they left, Averhart heard the man yell, "saying something about him being Moes or something and get the f*** out, just gang, gang, gang -- I just heard gang things." Men who had been hanging out by the store continued to follow Averhart and defendant, and she heard someone say "they about to blow," which she understood to mean "[t]hey were going to shoot." After hearing that, Averhart observed "a guy like reaching at his waist." Averhart believed she and defendant were going to get shot, and she began to run home. As she ran, she heard shots but did not see anyone fire a gun and did not know who fired the shots. She had been afraid the entire time. She subsequently moved from the house she had been living in near 69th and Prairie Avenue because she was afraid.

¶ 20 Averhart identified herself, defendant, and the man who followed her and defendant into the store and yelled in the video from inside the Fair Food Mart. She also identified two people in the video who worked at the store and who had tried to calm the man down. She additionally identified herself and defendant in the video outside the store. She acknowledged three people in the video followed her and defendant into the street and one of them had stated, "they're about to blow."

¶ 21 On cross-examination, Averhart testified she was still in a relationship with defendant. She reiterated she had been scared while inside the store but acknowledged she had not seen anyone

with a gun in the store. Averhart did not know that defendant had a gun that night. She acknowledged that the man yelling at the two of them did not block their exit from the store and allowed them to walk out. She understood the term "Moes" to mean "gangs." She did not know how many shots she heard and did not return to the scene that night or contact the police following the shooting. Averhart subsequently learned someone died. She did not voluntarily speak with the police after defendant had been arrested and had been subpoenaed for the grand jury.

¶ 22    Averhart acknowledged that she testified before the grand jury in 2015 that "about" 10 or 12 people followed them out of the store on the night in question. She recalled testifying before the grand jury that defendant had discharged a firearm toward a group that night, and she did not recall anyone else having a gun that night. She also had testified that the group of people were five to seven feet from them as they walked away from the store. Averhart acknowledged that she knew in 2015 that defendant had discharged a firearm that night.

¶ 23    On redirect, Averhart clarified that, on the night of the shooting, she heard gunshots but did not know who fired the shots and learned later that it had been defendant. Both Averhart and defendant were trying to leave that night and were walking away when the group of people followed them from the store and continued to threaten them. Based on what the group was saying, she turned around as they walked and saw a man reach toward his waistband. Several other men were around him. Because she had lived in the area near the Fair Food Mart, she had seen people outside the store before "[d]rink, talk, talk gang."

¶ 24    Defendant testified that he had known Averhart since third grade. They had a child together and lived together at the time of the shooting. That night, he had been worried that she would be hurt when they left the Fair Food Mart. They went to the store to get a few items, including milk

for his daughter. He did not get milk because the man approached him, so he was "hurrying up to leave."

¶ 25 Defendant observed people drinking and smoking outside the store when he approached it. When he was leaving the store, a man told him that he did not belong there, "get the f*** out of there, and was like sort of directing [defendant] with his hands to get the f*** up out of there." While the man was speaking, defendant believed he was "about to be hurt" because the man was being aggressive and smelled like alcohol. The man got in defendant's face as he was leaving the store and defendant was forced to walk around him. The man used gang terminology and said "Stones rule, b***," which defendant understood to mean that he "was about to get [his] a*** kicked."

¶ 26 Approximately 5 to 10 people followed defendant from the store. They got into the middle of the street and were "saying things like blow, we'll blow *** his a*** down, Moe. F*** him. Blow his a**** down. Blow his a*** down." One man was reaching into his pocket near his waistband, and defendant fired his gun.

¶ 27 Defendant identified in the video a man in a white shirt waving his arms and another in black "reaching." Defendant believed the men were trying to "close him in" and attack him. He pointed out the man who followed him into the store and stated that the man blocked him and Averhart from leaving.

¶ 28 Defendant testified he fired his gun because someone was yelling to "blow [him] down" and he believed the man he saw "reaching" was reaching for a gun, and he did not want Averhart and himself to get shot. He acknowledged that he fired his gun multiple times. Defendant was going backwards toward his home while firing and was not "going at" anyone with his gun. He

did not simply run because, once he was threatened, he could not turn his back because he was afraid of being shot. Upon arriving home, he called his mother to let her know he was going to her home. He wanted to "get out of that area" because "they" were going to kill him.

¶ 29    Defendant acknowledged he had two prior felony convictions for possession of 3,500 grams cannabis in 2009 and aggravated unlawful use of a weapon in 2011.

¶ 30    On cross-examination, defendant testified he retrieved his gun prior to going to the Fair Food Mart. He acknowledged that in 2015, he was not legally allowed to own a gun and obtained one by illegal means. Defendant carried the gun in his waistband. He denied regularly carrying the gun. No one in the store threatened him with a gun or displayed a gun.

¶ 31    Although the man who confronted him in the store allowed defendant and Averhart to leave, defendant was "very scared" as they left and as they crossed the street to the vacant lot. When asked whether he could have run, he acknowledged he "could have," but he "was being threatened, so why take off and run and risk being *** harmed from behind?" However, he admitted that, at that point, no one had pulled out a gun.

¶ 32    When defendant observed the man reach down to his pocket, he shot in that direction but did not aim for the man. After firing the first shot, the people outside ran toward the store, west on 69th Street, or south on Indiana Avenue. Some of the men "that were to the side more so ducked off a little bit." Nevertheless, defendant was still scared when he fired the subsequent shots, despite everyone running. He clarified the shots were fired within seconds of each other but acknowledged he pulled the trigger nine times. Defendant brought the gun back to his home and did not turn it in to the police. He did not call the police that night to report being threatened and firing in self-

defense. Defendant denied hearing that anyone had died that night and had been unaware that the police were looking for him.

¶ 33    Following arguments, the court found defendant guilty of second degree murder. In so finding, the court noted "a fair portion" of the evidence, including the video, was uncontroverted. The video showed defendant and Averhart entering the store and being accosted by a group of individuals who had been drinking. The court noted McGhee acknowledged the group of men used "many harsh words, gang-oriented words, words that one could interpret as a precursor to violence." Moreover, McGhee's testimony showed that the group "confronted" defendant. The court found that, to put it "mildly," there was discourteous behavior by "some gangbangers" who confronted "someone who maybe they didn't recognize, acting aggressively towards them, treatment them badly." It additionally noted that defendant knew or should have known his actions created a strong probability of death or bodily harm, but that Averhart's presence might have indicated there was no premeditation on defendant's part.

¶ 34    The court concluded the State proved first degree murder and defendant proved by a preponderance of the evidence that he fired his gun because "he had an unreasonable belief that he was defending himself." It found that defendant believed he was acting in self-defense, based on the men's gesticulations, but his belief was unreasonable because he had put distance between himself and the men confronting him, and he never saw anyone with a gun.

¶ 35    The court clarified it found defendant guilty of all six remaining murder counts (counts I, II, V, VI, IX, X) which merged, "meaning that *** every murder count has been proved, but *** on every one there is merger. And second-degree murder is the appropriate finding on each of those counts of first-degree murder."

¶ 36    The court denied defendant's motion to reconsider, finding the distance between defendant and the victim and the fact that he separated himself from the group before firing nine shots toward them "gave [it] pause about the imminence of the threat." The court stated the evidence showed the threat was not imminent and the use of force was "not appropriate."

¶ 37    At the sentencing hearing, the State read victim impact statements from Amanda Adetelo and Rashida Lucas. In her statement, Adetelo said that, on the night of the shooting, she had just finished cooking Simpson's favorite meal when she heard multiple shots nearby. One of Simpson's friends told her that Simpson had been shot. Adetelo ran to the street and saw Simpson on his back, not moving. She saw that he looked terrified, and she felt helpless. The emergency responders would not tell her where they were taking Simpson and did not leave immediately for the hospital. Adetelo returned to her house and was later informed Simpson died. Adetelo was unemployed and became homeless when Simpson was killed because he had paid the rent. When she was eventually able to get a job and apartment, her new apartment caught fire. Adetelo was hospitalized from complications arising from the fire, although she had started doing better. However, she still woke up "every night three to four times" and was "heartbroken."

¶ 38    Lucas, the mother of Simpson's oldest child, his daughter Nailah, described the emotional impact of Simpson's death on her daughter and how her daughter would be deprived by not having her father in her life.[2]

¶ 39    Defendant's presentence investigation report (PSI) showed he was 29 years' old. He had prior convictions for possession of a controlled substance from 2009, for which he received 24

---

[2]The State noted that Simpson's daughter Nailah submitted a victim impact statement and asked the court to review it. The court indicated it had already reviewed the statement. However, the statement is not contained in the record on appeal.

months' probation, and aggravated unlawful use of a weapon by a felon from 2011, for which he received 2 years' bootcamp. Defendant also had a pending 2018 case for mob action. The PSI reported defendant had a "great" childhood, dropped out of school in 11th grade due to marijuana use and peer pressure, and worked from the time he was 13, most recently as a mechanic around his neighborhood prior to being incarcerated. Defendant had been in a relationship with Averhart for 10 years and their 6-year-old child lived with her. He additionally had a nine-year old son, who lived with his mother in Chicago, and a three-year-old son who lived with his mother in Iowa. Defendant had prior gang affiliations but "decided to change his life."

¶ 40    In aggravation, the State argued defendant had a criminal background and was the only person with a gun when he shot Simpson. It requested the 20-year maximum sentence.

¶ 41    In mitigation, defense counsel submitted a letter from the assistance principal of Kenwood Academy where defendant attended high school, a letter showing defendant had been participating in clinical therapeutic groups, and a letter from one of defendant's former bosses. Defense counsel mentioned that the PSI showed defendant was raised by his mother, a single parent, who had been present at every court date. Defendant helped out his mother financially from the age of 13 and continued to help Averhart. He was involved in his children's lives and worked to support them. Defense counsel asked for a 10-year sentence, which would acknowledge the seriousness of the crime while balancing defendant's rehabilitative potential.

¶ 42    Defendant apologized to Simpson's family, stating he never "wanted to do anything" to anyone that night. He additionally thanked the court and noted he was "just doing this for [his] children."

¶ 43     The court sentenced defendant to 18 years' imprisonment for second degree murder. In imposing sentence, the court stated it considered the evidence presented at trial, the PSI, the evidence in aggravation and mitigation, the statutory factors in aggravation and mitigation, the financial impact of incarceration, the parties' arguments, the victim impact statements, and defendant's elocution. The court noted defendant was found guilty of second degree murder, which was "mitigating to reach that point," it had found defendant's belief in self-defense was unreasonable. It went on that it was "mindful" that defendant had "now thrice been convicted in Cook County of criminal offenses," which could not "go unconsidered." After imposing the 18-year sentence and giving defendant credit for time served, the court stated: "It's important to consider the fact that had he been found guilty of first degree murder he would have been looking at 45 years at 100 percent."

¶ 44     The court denied defendant's motion to reconsider sentence. Defendant timely appealed.

¶ 45     On appeal, defendant first contends the State failed to prove beyond a reasonable doubt that his belief that he and Averhart faced imminent death or great bodily harm was unreasonable.

¶ 46     On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or

unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens,* 237 Ill. 2d 311, 334 (2010).

¶ 47    Charged with nine counts of first degree murder, defendant was found guilty of six counts of second degree murder based on his unreasonable belief in his need for self-defense (720 ILCS 5/9-2(a)(2) (West 2014)).[3] As relevant here, a person commits first degree murder when he kills another person without lawful justification and, in performing the acts that cause the death: "(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another[.]" 720 ILCS 5/9-1(a)(1), (2) (West 2014).

¶ 48    Second degree murder is a mitigated version of first degree murder. *People v. Parker*, 223 Ill. 2d 494, 504 (2006). First degree and second degree murder share the same elements, but the presence of a mitigating factor reduces an unlawful homicide from first degree murder to second degree murder. *People v. Flemming,* 2015 IL App (1st) 111925-B, ¶ 53. A person commits second degree murder when he commits first degree murder but, at the time of the killing, he either (1) acted under a serious provocation or (2) had an unreasonable belief in the need for self-defense. 720 ILCS 5/9-2(a)(1)-(2) (West 2014). Thus, self-defense is a recognized legal justification to first degree murder. *Flemming,* 2015 IL App (1st) 111925-B, ¶ 54.  However, a defendant is justified in the use of force which is intended or likely to cause death or great bodily harm only if he

---

[3]We note that, although the trial court merged all six of the second degree murder counts, defendant's mittimus incorrectly reflects two concurrent sentences for second degree murder. The court's oral pronouncement is the court's judgment, and it controls over the mittimus. *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 62.

reasonably believes that such force is necessary to prevent (1) imminent death or great bodily harm to himself or another, or (2) the commission of a forcible felony. 720 ILCS 5/7-1 (West 2014); *People v. Nolan,* 214 Ill. App. 3d 488, 495 (1991).

¶ 49    To raise a claim of self-defense, defendant was required to provide some evidence that: (1) unlawful force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) defendant actually and subjectively believed a danger existed that required the use of the force applied; and (6) his beliefs were objectively reasonable. 720 ILCS 5/7-1 (West 2014); see also *People v. Lee,* 213 Ill. 2d 218, 225 (2004).

¶ 50    Once defendant met his burden, the burden of proof shifted to the State to prove beyond a reasonable doubt not only the elements of first degree murder but that defendant did not act in self-defense. *People v. Gray,* 2017 IL 120958, ¶ 50. If the State negates any one element of self-defense, the claim of self-defense fails. *Id.* Whether defendant acted in self-defense is a question for the trier of fact. *People v. Goliday,* 222 Ill. App. 3d 815, 822 (1991). When the trial court finds a defendant failed to prove the presence of a mitigating factor, we will affirm if we determine that, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the mitigating factors were not present. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 144.

¶ 51    Defendant does not dispute that the State carried its burden with respect to first degree murder. Nor does he dispute that his shooting a gun at a group of people was a use of force intended or likely to cause death or great bodily harm. Rather, he argues he believed his shooting was justified because he and Averhart faced imminent death or great bodily harm (see 720 ILCS 5/7-1

(West 2014)) and the State failed to prove beyond a reasonable doubt that his belief was unreasonable (see 720 ILCS 5/9-2(a)(2) (West 2014)).

¶ 52    We find the evidence was sufficient to support a conviction for second degree murder. It is uncontested that defendant shot and killed Simpson, and there is some evidence showing defendant acted in self-defense. When defendant and Averhart entered the Fair Food Mart, they were accosted by Rell, who yelled and gesticulated at defendant while he paid for his items. Defendant and Averhart exited the store quickly in an effort to leave the hostile situation, but Rell followed them out, yelling gang-related statements. As defendant and Averhart walked away and crossed the street, they were followed by Rell and others who had been standing on the corner. The men following them yelled "blow" him down, which defendant and Averhart believed to mean "shoot." Defendant and Averhart both testified they were afraid during the entire encounter.

¶ 53    Defendant and Averhart made it to a vacant lot across the street. When one of the men reached toward his pocket or waistband, Averhart started running. Defendant, believing the man would shoot him, did not want to turn his back so pulled a gun from his waistband and fired nine shots in the direction of the men, hitting and killing Simpson. Thus, there was evidence showing defendant was not the initial aggressor; unlawful, deadly, and imminent force was threatened against him by the men who threatened to shoot him; and defendant subjectively believed a danger existed that required use of force to protect his life from those men.

¶ 54    However, viewing the evidence in the light most favorable to the State as we must, we find the State proved defendant's belief in the need for self-defense was not reasonable. See *Gray,* 2017 IL 120958, ¶ 50. While defendant subjectively believed deadly force was justified to protect himself, the witnesses, including defendant, agreed that they did not see anyone else with a gun

that night and no one actually used unlawful force against defendant. Moreover, as the trial court pointed out, defendant and Averhart had crossed into the vacant lot and put space between them and the group of men verbally threatening them. They were distant enough that Averhart was able to run away. But instead of following her, defendant chose to shoot into the unarmed group of men. He then fired eight more shots, pulling the trigger each time, even though the men had ducked and scattered and did not fire back. From this evidence, we find a rational trier of fact could find beyond a reasonable doubt that defendant's belief that firing nine shots at the men was necessary to prevent imminent death or great bodily harm to himself or Averhart was not reasonable. Accordingly, we find the evidence proved beyond a reasonable doubt that defendant committed second degree murder.

¶ 55    Defendant next argues that the trial court abused its discretion in sentencing him to 18 years' imprisonment because it considered an "irrelevant factor" when it stated that defendant faced a 45-year sentence had he been convicted of first degree murder. He further argues the court failed to consider two statutory factors in mitigation. He asks that his sentence be reduced to five years.

¶ 56    We accord great deference to a trial court's sentence and will not reverse it absent an abuse of discretion. *People v. Butler*, 2013 IL App (1st) 120923, ¶ 30 (citing *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000)). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson,* 375 Ill. App. 3d 796, 800 (2007)). The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. In determining an appropriate sentence,

the trial court considers such factors as "a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need to protect society, and the need for deterrence and punishment." *People v. Hernandez*, 319 Ill. App. 3d 520, 529 (2001). Because the trial court, having observed the proceedings, is in the best position to weigh the relevant sentencing factors (*People v. Arze*, 2016 IL App (1st) 131959, ¶ 121), we do not substitute our judgment for that of the trial court simply because we would have balanced the appropriate sentencing factors differently (*People v. Alexander*, 239 Ill. 2d 205, 213 (2010)).

¶ 57    Here, defendant was sentenced to 18 years' imprisonment, which falls within the sentencing range of 4 to 20 years for the Class 1 offense. 720 ILCS 5/9-2(a)(2), (d) (West 2014); 730 ILCS 5/5-4.5-30(a) (West 2014) (sentencing range for second degree murder). Thus, we presume his sentence was proper, absent some indication otherwise. See *People v. Burton,* 2015 IL App (1st) 131600, ¶¶ 36, 38 (A defendant "must make an affirmative showing that the sentencing court did not consider the relevant factors.").

¶ 58    Nothing in the record shows defendant's sentence was improper. While the trial court acknowledged there were some mitigating circumstances present, we cannot say that the 18-year sentence was manifestly disproportionate to the nature of the offense. Moreover, in imposing sentence, the court expressly stated it considered defendant's criminal history, the evidence presented at trial, the PSI, the evidence in aggravation and mitigation, the statutory factors in aggravation and mitigation, the financial impact of incarceration, the parties' arguments, the victim impact statements, and defendant's statement in elocution. Given the trial court's consideration of the relevant sentencing factors, the sentence imposed was not an abuse of discretion.

¶ 59    In reaching this conclusion, we reject defendant's contention that the trial court improperly considered the potential of a much longer sentence had he been convicted of first degree murder. The burden is on defendant to establish that an alleged improper sentencing considerations led to a greater sentence. See *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 49. The record shows in this case that the trial court imposed sentence after considering the relevant factors and did not mention the potential 45-year sentence for first degree murder until after sentence had been imposed. Thus, defendant has not shown that it was a factor relied upon by the court at sentencing.

¶ 60    We also reject defendant's argument that the court failed to weigh in mitigation that he acted under strong provocation and there were substantial grounds tending to excuse or justify his conduct. See 730 ILCS 5/5-5-3.1(a)(3), (4) (West 2018) (setting forth mitigating factors to be considered at sentencing). First, absent an indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. Second, as previously noted, the court specifically stated it considered all factors in mitigation, which necessarily includes those factors defendant raises here. Lastly, a trial court is not required to recite each factor and the weight it is given at a sentencing hearing. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Thus, the court's failure to state that is considered these specific mitigation factors does not demonstrate that it did not consider them. Defendant having presented no evidence that the court did not consider strong provocation and grounds justifying the criminal conduct in mitigation, his argument fails.

¶ 61    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 62    Affirmed.