NOTICE
Decision filed 08/16/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220441-U

NO. 5-22-0441

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 21-CF-752 |
| | ) | |
| CHARLES BERNARD SHAW, | ) | Honorable |
| | ) | L. Dominic Kujawa Jr., |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Vaughan and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm defendant's conviction for second degree murder where defendant's use of deadly force was objectively unreasonable. We remand for a new sentencing hearing where the trial court improperly relied upon a pending gun charge in aggravation during sentencing.

¶ 2    A jury in the circuit court of St. Clair County found defendant guilty of second degree murder (720 ILCS 5/9-2(a)(2) (West 2020)) for the shooting death of the victim, Terrill Vance, and the court sentenced him to 12 years in prison. On appeal, defendant contends that (1) the State failed to disprove that defendant was justified in killing the victim and (2) the court erred when it improperly relied on a pending gun charge as an aggravating factor during sentencing. For the following reasons, we affirm defendant's second degree murder conviction and remand for a new sentencing hearing.

1

¶ 3                                    I. BACKGROUND

¶ 4     We limit our recitation to the facts, evidence, and testimony relevant to our disposition of this appeal. We will recite additional facts in the analysis section as needed to address specific arguments.

¶ 5     On May 9, 2021, an altercation between defendant and the victim resulted in defendant shooting and killing the victim. On June 4, 2021, the State charged defendant by indictment with one count of first degree murder in violation of section 9-1(a)(2) of the Criminal Code of 2012 (*id.* § 9-1(a)(2)), alleging that defendant, without lawful justification and with the intent to kill or do great bodily harm to the victim, shot the victim in his head and body with a firearm, thereby causing the victim's death. The State further alleged that defendant discharged a firearm proximately causing the victim's death, requiring a 25-year firearm enhancement (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2020)). Defendant retained counsel and gave notice that he would present the affirmative defense of self-defense and defense of others at trial.

¶ 6     On April 25, 2022, defendant's three-day jury trial commenced. The trial court conducted *voir dire* and a jury was selected. The following day, the parties presented opening statements and the following testimony. We recount only the testimony pertinent to the issues on appeal.

¶ 7     The State called Cryshundra Walker, who testified to the following. Walker worked an overnight shift from May 8 to May 9, 2021, at a MotoMart gas station in Sauget, Illinois. Around midnight, while standing at the glass-partitioned walk-up register, Walker overheard arguing by the gas pumps in the gas station parking lot. A silver car followed by a silver van pulled into the lot, followed shortly thereafter by a black car. The black car pulled in front of the silver car. Walker testified that she heard two voices yelling back and forth. A man exited the silver van and walked to the silver car. He then returned to the silver van and "got something out." The man from the

2

silver van and the man from the silver car then walked towards the entryway. As the two walked towards the entryway, the black car pulled around and parked by a gas pump near the entryway of the gas station. The two men walked past the black car and into the entryway. Walker observed a black handgun in the hand of the man from the silver van. When the man in the black car opened his driver side door, the "man in the black hoody *** turned towards the black car and he proceeded to walk towards him. And that's when [I] heard the first shot." Walker testified that there were about four to six shots. After the shooting, the two men reentered the silver van and silver car, respectively, and left the gas station. Walker called her supervisor, who advised her to activate the silent alarm. After police arrived, Walker provided them with the surveillance footage.

¶ 8     The State then published to the jury five angles of surveillance footage that depicted the shooting. The footage showed a silver Chevy Malibu driven by Pierre Shaw, defendant's brother, pull into the gas station next to a gas pump, followed directly behind by a silver Chrysler Town and Country van driven by defendant. Seconds later, a black Infiniti, driven by the victim, pulled past the two cars and stopped facing the silver car. Defendant walked from the silver van to the silver car but quickly turned around and returned to the van. Pierre is seen opening the driver side door of the silver car while the black Infiniti pulled towards the pumps nearest the gas station's entryway. The footage showed the victim speak out of his driver's side window at Pierre. Pierre then exited the silver car as defendant walked up to Pierre and placed his hood over his head. The black Infiniti pulled forward a third time and parked next to the gas pumps directly in front of the entryway. A few seconds later, defendant and Pierre walked towards the entryway, walking only a few feet behind the black Infiniti. As defendant and Pierre approached the entryway, defendant removed the handgun from his waistband and held it in his right hand. The victim opened his car door, and defendant immediately rushed from the entryway, ran around the back of the black

3

Infiniti, and fired several shots at the victim from a few feet away. The victim fell to the ground beside his car. Defendant and Pierre then quickly returned to their respective vehicles and left the gas station. None of the five angles definitively showed an object in the victim's hand or that he extended his arm out of his car window. There is no audio contained in the footage.

¶ 9  The State called Josh Easton, who testified to the following. Easton is a crime scene investigator with the Illinois State Police. On May 10, 2021, Easton reported to the Sauget Police Department to process a black Infiniti G37. Easton took photographs of the interior and exterior of the vehicle and the images were published to the jury. Easton indicated that he collected nothing of evidentiary value besides a fired projectile located in the front passenger floorboard. On cross-examination, Easton testified that he did locate a black portable radio with a "thicker antenna" which defense counsel then opined could possibly "look like a barrel." The State later recalled Easton to the stand where he testified that the radio was located in the mesh seat pocket behind the front passenger seat. On cross-examination, Easton indicated that the radio within the pocket could be reached from the driver's seat. A photograph of the radio was published to the jury.

¶ 10  The State also called Terri Shaw, who testified to the following. Terri is the mother of defendant and defendant's brother, Pierre Shaw. Pierre drove a silver Malibu and defendant drove a silver van with a dent on the side. Terri was shown a still image taken from one of the surveillance videos. Terri identified the two men in the image as her sons, defendant and Pierre. She wrote their names on the image with arrows identifying each son.

¶ 11  On the final day of trial, the State called Dr. Gershom Norfleet, who testified to the following. Dr. Norfleet is an assistant medical examiner for the St. Louis County Medical Examiner's office. Norfleet performed the autopsy on the victim. Dr. Norfleet identified six wounds on the victim, indicating three entrance and three corresponding exit wounds. The entrance

4

wounds were "located on the central portion of the chest, one was on the right cheek, and then one was on the inside of the left thigh." Dr. Norfleet described in detail to the jury the photographs taken during the autopsy. The gunshot wound on the central chest correlated to an exit wound on the left back, which demonstrated that "in terms of the trajectory in which the bullet moves through the body, it's going downward, it's going to the left and it's going backward." The gunshot wound on the right cheek correlated to an exit wound through the left armpit, which indicated that "the bullet is *** going [from the] left to the back, and then going downward." The gunshot wound on the inside of the left thigh correlated to an exit wound on the back side of the left thigh. The path of the bullet traveled "downward" and to the left. Dr. Norfleet observed "stippling" on the wound to the right cheek, which indicated that "that particular shot that was fire[d] was about a foot, foot and a half, to three feet away when it occurred." The victim's wounds indicated that defendant shot the victim three times at close range. The State inquired into Dr. Norfleet's opinion regarding the trajectory of the bullets:

"Q. And you've talked quite a bit about the path of the bullets, the trajectory of the bullets through the body. Based off your opinion, is the *** path of those bullets, would that be consistent with the body being lower than the gun as [the] gun's being fired?

A. That's correct."

On cross-examination, Dr. Norfleet indicated that the victim was 6 feet, 2 inches tall and weighed 236 pounds. After the State rested, defense counsel made an oral motion for a judgment of acquittal, notwithstanding the verdict, arguing that the State failed to prove every essential element of the charge. The trial court denied the motion stating, "It's for the jury to decide. Motion denied."

¶ 12    The defense then called defendant to testify in his own defense. Defendant testified to the following. On the night of May 9, 2021, defendant fell asleep in his van parked in front of his

mother's house. He testified that he often did this after work. Defendant's brother, Pierre Shaw, arrived and asked defendant to follow him in his vehicle to the MotoMart gas station because Pierre's car was nearly out of gas. Defendant testified that he had a slow leak in his tire, so he would fill up his tire with air while his brother pumped gas. While waiting to make a left turn, the victim "was flying, coming down the street. Almost—missed Pierre, about an inch." After defendant and Pierre pulled into the gas station, defendant exited his car. Defendant observed the victim make a U-turn and "by the time I go [*sic*] tell my brother what's going on, [the victim] pulls up." Defendant testified that "[the victim] had something black in his hands, he was pointing at me and my brother. [The victim said,] 'I'm going to kill both of you MF.' " Defendant told Pierre that the victim was talking to him, but the victim allegedly responded, "No, I'm talking to both of you two. I'm going to kill." Defendant then returned to his van. After "searching through his whole van," defendant retrieved his handgun. Defendant and Pierre then walked towards the entryway of the gas station, at which time the victim pulled his car around until it was parked at a gas pump near the entryway. Defendant testified that during the walk to the entryway, the victim was still "steady pointing" the black object at him, repeating "I'm going to kill both of you." Defendant and Pierre "didn't pay [the victim] no mind [*sic*]." As defendant and Pierre walked past the victim's car, the victim said, "When I get out of my car, I'm going to kill both of you." At that point, the victim opened his driver-side door and "[Pierre] say, 'Here he come,' that's when I ran around, boom, boom, boom, boom. This and that." Defendant, scared and unsure what to do next, did not call police. Defendant believed the black object in the victim's hand was a gun.

¶ 13    Immediately following the shooting, defendant testified that he left the gas station and drove straight to a hotel where he lived with his girlfriend. Defendant hid the gun in a dresser. The next day, defendant cooked fish for a Mother's Day event that he attended for his church at a local

6

bowling alley. Defendant received a call from his mother informing him that police wanted to speak with him. Defendant first returned to the hotel. After he left the hotel to turn himself in, police stopped and arrested him. Defendant admitted that he lied to police during his initial interview. He initially told investigators that he parked his van in a vacant lot and went for a walk after the shooting. During his walk, defendant claimed "someone broke into my van and *** took the gun out of there."

¶ 14     On cross-examination, defendant admitted that he lied to police about the whereabouts of the gun during the initial interview. Defendant testified that he could not call police after the shooting because his phone was dead. The State inquired why defendant could not ask the MotoMart clerk or another nearby establishment if he could use their phone. Defendant responded that no one would let someone use their phone because "people get robbed, people get hurt." The following colloquy took place between the State and defendant:

"Q. Your testimony is that, if I understood it correctly, as soon as [the victim] hits that lot, he's got something black pointed at you?

A. Yes, he does.

Q. Okay. And it's pointed out the window?

A. Yes, he does.

Q. Arm extended?

A. Yes, it was.

Q. Okay. And you could clearly see it's a firearm?

A. Yes, I would.

Q. You could clearly see it's a firearm.

A. I could see whatever he had in his hand, if it was a firearm or not, at the point when he said he's going to kill both of us, and he pointed at the same time as he's saying it. So that's the reason why *** I walked back to my van.

Q. In fact, [the victim] has something that you believe is—you believe it's a firearm, right?

A. Yes.

Q. Okay. But we know it's not a firearm because there's no firearm on the lot.

A. Okay."

On cross-examination, defendant later testified that immediately following the shooting, he got into his van and left the lot, despite saying his brother's car was out of gas. Defendant acknowledged that he acquired, cooked, and delivered fish on Mother's Day for an event near the police department. Despite this, defendant did not turn himself in. Defendant testified that he ran up and shot the victim because the victim moved his car three times and then "said when he got out [of] the car, he's going to kill [defendant and Pierre]."

¶ 15    The circuit court instructed the jury on three theories of first degree murder (intentional, knowing, and strong probability murder), and that defendant personally discharged a firearm causing death or great bodily harm. The court also instructed the jury of second degree murder, self-defense, and defense of others. Following deliberations, the jury returned a verdict finding defendant guilty of second degree murder.

¶ 16    On May 11, 2022, defendant filed a motion for judgment notwithstanding the verdict or for a new trial, which the trial court denied. On June 29, 2022, the court held a sentencing hearing. Andrea Vance, the victim's sister, testified in aggravation and read her victim impact statement. The State requested a sentence of 20 years' imprisonment. Defense counsel asked for a minimum

term of four years in prison. The court reviewed the presentence investigation report that contained the following entry regarding defendant's criminal history:

"Madison County, Illinois Case Number 19-CF-835: The defendant was arrested on Monday, March 11, 2019, by the Granite City, Illinois Police Department for Aggravated Unlawful Use Of Weapon/Vehicle (Felony). This matter is currently pending."

While discussing aggravating factors in sentencing, the trial court noted the pending case:

"It is a 19 style case, and it does say he was arrested in March. So without further information, [defendant] had to be on bond for a gun charge. He's on bond or he's charged, whatever it may be. But there's a charge and it's still pending. That was prior to this charge. And it seems it was an escalation from carrying a gun. *** But he's still carrying a gun. Maybe not the same gun. I assume it's a different gun. So that's something else I have to take into consideration as far as aggravation.

\* \* \*

\*\*\* But I disagree with [defense counsel]'s characterization of [defendant's] history being limited for the simple fact that there was this Madison County charge pending at the time of this shooting."

The court emphasized the role firearms played in the case. The court stated, "We all in here today, because of guns, we shouldn't be here for that." The court also noted that "if there's no guns at that MotoMart on that night, none of us *** are sitting here. It's because there was a gun."

¶ 17    The trial court sentenced defendant to 12 years' imprisonment, followed by 2 years of mandatory supervised release.

9

¶ 18    Defendant filed a timely notice of appeal.

¶ 19                                    II. ANALYSIS

¶ 20                                    1. Self-Defense

¶ 21    Defendant first argues on appeal that the State failed to disprove that defendant was justified in killing the victim in self-defense. In support, defendant contends that the victim "in a road rage incident followed [defendant] and his brother Pierre *** to the gas station parking lot, aggressively confronted them, and repeatedly threatened to kill [defendant] and his brother while pointing a black object at them that [defendant] believed to be a gun." Defendant also argues that he shot the victim "only after [the victim] stated before opening his door, 'When I get out of my car, I'm going to kill both of you.' " The State responds that the jury found defendant's subjective belief that deadly force was required to be unreasonable and therefore the evidence proved defendant guilty beyond a reasonable doubt of second degree murder. We agree with the State.

¶ 22    When a defendant challenges the sufficiency of the evidence used to convict him, this court reviews the evidence presented at trial in the light most favorable to the prosecution and determines whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). It is not the function of this court to retry defendant. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). The trier of fact—in this instance, the jury—is responsible for determining witness credibility, weighing the evidence, and drawing reasonable inferences from the evidence, not the reviewing court. *People v. Yeoman*, 2016 IL App (3d) 140324, ¶ 18. A reviewing court will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Id.*

¶ 23    Here, the State charged defendant with first degree murder. 720 ILCS 5/9-1(a)(2) (West 2020). The jury found defendant guilty of the lesser mitigated offense of second degree murder. *Id.* § 9-2(a)(2); *People v. Jeffries*, 164 Ill. 2d 104, 122 (1995). A defendant is guilty of second degree murder if the elements of first degree murder are established but a statutory mitigating factor also exists. *People v. Brown*, 2014 IL App (4th) 120887, ¶ 24. Here, defendant raised the affirmative defense of self-defense. When self-defense is asserted, the State must not only prove the elements of first degree murder. *Jeffries*, 164 Ill. 2d at 127. The State must also prove that the murder was not done in self-defense, and that the defendant's use of force was not legally justified. *Id.* To successfully raise self-defense, the defendant must establish some evidence of the following elements:

> "(1) force is threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *Id.* at 128.

However, if the State "negates *any one* of the self-defense elements, the defendant's claim of self-defense must fail." (Emphasis in original.) *Id.* To maintain a defense of complete self-defense, all six factors must be present. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149. If only the first five are present, then there is incomplete self-defense and a second degree murder conviction can be sustained. *Id.*

¶ 24    On appeal, defendant asserts that the State failed to prove beyond a reasonable doubt that one of the elements was not satisfied and therefore this court should find complete self-defense and reverse his second degree murder conviction. In response, the State contends that, given its

11

verdict, the jury found that defendant had an actual and subjective belief that the situation required the use of deadly force, but that the jury "properly found that this belief was not objectively reasonable."

¶ 25    Viewing the evidence in the light most favorable to the prosecution, we cannot find that the jury's determination that defendant's subjective belief that deadly force was necessary was unreasonable as "palpably contrary" to the evidence or "so unreasonable, improbable, or unsatisfactory that it justifies entertaining a reasonable doubt of the defendant's guilt." *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986) (quoting *People v. Jordan*, 18 Ill. 2d 489, 492-93 (1960); *People v. Evans*, 87 Ill. 2d 77, 86 (1981)). We must affirm if any rational trier of fact could have found defendant failed to prove any one of the six factors of self-defense by a preponderance. *Castellano*, 2015 IL App (1st) 133874, ¶ 160. The evidence shows that a rational trier of fact could find that defendant had a subjective belief that deadly force was necessary, but that ultimately this belief was not reasonable. The use of force is justified "if he *reasonably* believes that such force is necessary to prevent imminent death or great bodily harm to himself or another." (Emphasis added.) 720 ILCS 5/7-1(a) (West 2020).

¶ 26    Based upon the surveillance videos and defendant's own testimony, the victim pulled his car into the gas station parking lot to confront defendant and Pierre about an alleged near miss on the road. A verbal exchange of alleged threats and insults took place, as evidenced by Walker's testimony that she heard two voices yelling. Following alleged threats of physical harm from the victim and apparent pointing of a black object, defendant returned to his van to search for a gun. Defendant and Pierre then walked past the victim's car to enter the gas station entryway. As defendant opened his driver side door, defendant ran up to the victim's door and shot the victim

12

three times at close range. Defendant then left the gas station without contacting police. No firearm or other deadly weapon was located on the victim or within his vehicle.

¶ 27    The jury saw the video and heard testimony from the defendant himself. The jury rejected a guilty verdict for first degree murder and, instead, found defendant guilty of second degree murder. This demonstrates that the jury believed that mitigating factors existed and that defendant had an actual and subjective belief that he needed to use deadly force. However, the jury, acting as a rational trier of fact, found that this belief was not reasonable and merited a second degree murder conviction, rather than a not guilty verdict. See *Jeffries*, 164 Ill. 2d at 129 ("To summarize, when a defendant is found guilty of second degree murder, the trier of fact has, in essence, concluded that the evidence that the defendant has offered was not sufficient to support his claim of self-defense. The defendant, however, has proven by a preponderance of the evidence the existence of a mitigating factor sufficient to reduce the offense of murder to second degree murder. *** [A]fter the defendant has presented the best evidence for his defense, the trier of fact has concluded that the evidence only supports a finding of second degree murder and not absolute justification for the defendant's actions."). Viewing the evidence in the light most favorable to the prosecution, we find that the evidence supports the jury's conclusion and we therefore affirm defendant's conviction for second degree murder.

¶ 28                                    2. Sentencing

¶ 29    Defendant next contends that the trial court improperly relied on a pending gun charge in aggravation when imposing defendant's sentence. The State responds that defendant failed to preserve this issue for appeal, there is no plain error, and the trial court did not improperly rely upon the pending charge. We agree with defendant.

13

¶ 30　Defendant concedes that he did not object to the error at sentencing and did not file a motion to reconsider sentence. However, he asks us to review this issue under the plain error doctrine. Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Under the plain error doctrine in the sentencing context, a defendant must first show that a clear or obvious error occurred. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). A defendant must then show either that (1) the evidence at the sentencing hearing was closely balanced or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* We must first determine whether any error occurred. *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 31　Where the trial court relies on an improper sentencing factor, a defendant may be entitled to a new sentencing hearing. *People v. Walker*, 2012 IL App (1st) 083655, ¶ 30. "[T]he mere listing of prior arrests, not resulting in convictions, in a presentence report [is improper]. We therefore hold that mere arrests, standing alone, without further proof of the conduct alleged, are inadmissible in the sentencing determination." *People v. Thomas*, 111 Ill. App. 3d 451, 454 (1983). We review *de novo* whether a court relied on an improper factor in imposing a sentence. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 32　Here, the trial court expressly stated that it took the pending gun charge into consideration as aggravation. The entry on the presentence investigation report merely stated that defendant was arrested on this charge and that the charge was pending. No further evidence was introduced regarding the charge. The State contends the trial court did not rely upon the pending charge or, alternatively, merely relied on the pending charge to note that defendant was potentially on bond at the time of the shooting. *People v. Martin*, 119 Ill. 2d 453, 458 (1988) (remand not required if record is clear that the improper factor was so insignificant that its consideration did not result in a greater sentence). Throughout sentencing, the trial court emphasized the role firearms played in

14

the case. The court stated, "We all in here today, because of guns, we shouldn't be here for that." The court also noted that "if there's no guns at that MotoMart on that night, none of us *** are sitting here. It's because there was a gun." Regarding the pending charge, the court did not merely note that defendant was potentially on bond at the time of the shooting, but further stated that the shooting at issue "was an escalation from carrying a gun." The court specifically stated that the pending gun charge was a factor in aggravation. At a minimum, we cannot say the record is clear that the pending charge was given insignificant weight in sentencing and therefore we must remand. *People v. Bourke*, 96 Ill. 2d 327, 332 (1983) (If a reviewing court "is unable to determine the weight given to an improperly considered factor, the cause must be remanded for resentencing."). The trial court's consideration of the pending gun charge constitutes a clear error that was so egregious it denied defendant a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. As such, defendant's sentence is vacated and the matter is remanded for resentencing.

¶ 33                                III. CONCLUSION

¶ 34    For the foregoing reasons, we affirm defendant's conviction for second degree murder, vacate defendant's sentence, and remand for a new sentencing hearing.


¶ 35    Verdict affirmed.

¶ 36    Sentence vacated; remanded for resentencing.